## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **HAROLD WAYNE NICHOLS,** | ) | **No. _____** |
| | ) | **Death Penalty Case** |
| **Plaintiff,** | ) | *Execution date August 4, 2020* |
| **v.** | ) | |
| | ) | |
| **TONY PARKER,** in his official capacity | ) | |
| as Tennessee's Commissioner of Correction, | ) | |
| | ) | |
| **TONY MAYS,** in his official capacity | ) | |
| as Warden of Riverbend Maximum | ) | |
| Security Institution, | ) | |
| | ) | |
| **JOHN AND JANE DOES, TDOC** | ) | |
| **Employees**, in their official capacities, | ) | |
| | ) | |
| **HERBERT H. SLATERY III**, in his official | ) | |
| capacity as Attorney General of the | ) | |
| State of Tennessee, | ) | |
| | ) | |
| **JUSTICES OF TENNESSEE SUPREME** | ) | |
| **COURT**, in their official capacities, | ) | |
| | ) | |
| **Defendants.** | ) | |

Susanne Bales
Asst. Federal Community Defender
Dana C. Hansen Chavis
Asst. Federal Community Defender

Federal Defender Services
 of Eastern Tennessee, Inc.
800 South Gay Street, Suite 2400
Knoxville, Tennessee 37929
Telephone: 865.637.7979
Email: Susanne_Bales@fd.org
        Dana_Hansen@fd.org

Abigail T. Reardon
DLA Piper LLP (US)
New York State Bar No. 1814557
1251 Avenue of the Americas
New York, New York 10020
Telephone: 212.335.4500
Email: Abigail.Reardon@dlapiper.com

Chelsea R. Dal Corso
DLA Piper LLP (US)
California State Bar No. 290663
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, California 90067
Telephone: 310.595.3000
E-mail: Chelsea.Dalcorso@dlapiper.com

*Counsel for Plaintiff Nichols*

# TABLE OF CONTENTS

Incorporation of Allegations ..................................................................... 3

Parties ...................................................................................................... 3

Jurisdiction and Venue............................................................................. 6

I.      Factual Allegations ........................................................................... 7

Introduction ............................................................................................. 7

COVID-19 has created states of emergency and upended functioning of the courts and their participants....................................................................... 8

Numerous State and National Executive and Judicial Emergency Orders Have Issued ...................................................................................................... 10

Counsel have significant obligations and duties when an execution date has been set ............................................................................................................ 16

Appointment Under 18 U.S.C. § 3599 .................................................... 16

Standards Governing Death Penalty Representation................................ 17

Clemency Power in Tennessee ................................................................ 22

The global pandemic has prevented counsel from performing essential tasks in the months prior to the execution ................................................................. 25

Relevant Counsel and COVID-19 Chronology......................................... 25

Defendants Warden Mays and Commissioner Parker, and Defendants John and Jane Does TDOC Employees have, without prior notice, changed visitation policies and procedures for friends, family, counsel, and spiritual advisors......................... 38

The prison has not disclosed how it will carry out an execution during a pandemic 41

Mr. Nichols is a practicing Christian; the prison without notice has restricted visitation with his spiritual advisor............................................................. 42

II.     Legal Claims.................................................................................... 44

Count One: ............................................................................................... 45

Proceeding with Mr. Nichols' August 4, 2020 execution violates his rights to Free Exercise of Religion under the First Amendment to the United States Constitution as well as under the Religion Land Use and Institutionalized Persons Act. ............ 45

Proceeding with Mr. Nichols' August 4 execution violates his rights to Free Exercise under the First Amendment ................................................................................. 47

Proceeding with Mr. Nichols' August 4 execution violates his rights under RLUIPA ................................................................................................................................. 49

Count Two: ..................................................................................................................... 51

Executing Mr. Nichols on August 4, 2020, during a global pandemic when other Tennessee inmates' execution dates have been moved because of the global pandemic violates Mr. Nichols' rights to Equal Protection under the Fourteenth Amendment. ................................................................................................................... 51

Count Three: .................................................................................................................. 56

Carrying out Mr. Nichols' execution during the global coronavirus pandemic, where visitation is severely restricted, is cruel and unusual in violation of the Eighth and Fourteenth Amendments to the United States Constitution and denies his rights of association guaranteed by the First Amendment. ..................................................... 56

Count Four: .................................................................................................................... 60

Carrying Out Mr. Nichols' August 4 2020 Execution during the pandemic where he is denied the opportunity to prepare and present his case for clemency is so arbitrary and unusual it shocks the conscience. ....................................................... 60

Count Five: ..................................................................................................................... 63

Proceeding to execution under pandemic conditions, where Defendants Parker and/or Mays, and/or Defendants John and Jane Does TDOC employees without notice changes policies and procedures, deprives Mr. Nichols of due process and access to the courts. ..................................................................................................... 63

Count Six: ....................................................................................................................... 66

Proceeding with Mr. Nichols' August 4, 2020 execution under the conditions created by COVID-19 deprives him of his statutory right to counsel under 18 U.S.C. § 3599. ......................................................................................................................... 66

Count Seven: .................................................................................................................. 73

Proceeding with Mr. Nichols' August 4, 2020 execution despite the COVID-19 pandemic violates Mr. Nichols' rights to "Minimal Due Process" under *Ohio Adult*

*Parole Authority v. Woodard* and the Fifth and Fourteenth Amendments to the United States Constitution. ....................................................................... 73

III.     Conclusion ........................................................................................... 80

Certificate of Service.................................................................................... 83

## Index to Exhibits

Exhibit 1      Governor Lee Executive Order No. 14

Exhibit 2      Governor Lee Executive Order No. 23

Exhibit 3      Governor Lee Executive Order No. 36

Exhibit 4      TSC Order suspending in-person court Proceedings – March 13, 2020

Exhibit 5      TSC Order continuing suspension of in-person court proceedings and extension of deadlines – March 25, 2020

Exhibit 6      TSC Order modifying court proceedings and further extension of deadlines - April 24, 2020

Exhibit 7      TSC Order Extending State of Emergency and Easing Suspension of In-Person Court Proceedings – May 26, 2020

Exhibit 8      Updated Declaration of David Aronoff – June 28, 2020

Exhibit 9      Declaration of Carol Wright – June 27, 2020

Exhibit 10    Declaration of Dana Hansen Chavis, with Attachments – June 27, 2020

Collective Exhibit 11 – Nichols' Tennessee Supreme Court pleadings

Exhibit 12    Request to TDOC for records – May 29, 2020

Exhibit 13    Email to Inglis for TPRA request update - June 23, 2020

Exhibit 14    Declaration of J.R. Davis – June 28, 2020

Collective Exhibit 15 – Oscar Smith's Tennessee Supreme Court pleadings

Collective Exhibit 16 – Bryon Black's Tennessee Supreme Court pleadings

Exhibit 17     *Gutierrez v. Saenz*, 19-8695, 2020 WL 3248349 (Jun. 16, 2020)

Exhibit 18     TDOC Visitation policy - #507.01

Exhibit 19     TDOC Attorney Access to Inmates - #105.09

Exhibit 20     Lethal Injection Execution Protocol manual

Exhibit 21     Electrocution Execution Protocol manual

Exhibit 22     Current News Articles

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

The execution of a person is the most extreme irrevocable act a State may carry out. The State of Tennessee intends to execute Plaintiff Harold Wayne Nichols on August 4, during the COVID-19 pandemic. The pandemic has imposed significant constraints on the courts, the prisons, and counsel, all to Mr. Nichols' detriment. Mr. Nichols has not been able to sufficiently meet with friends, family, counsel or his spiritual advisor. The prison has not disclosed how it intends to carry out an execution during the pandemic. Counsel have been unable to investigate and prepare for clemency. The Tennessee Supreme Court has moved execution dates that occur before and after Mr. Nichols but has arbitrarily refused to move Mr. Nichols' date. Mr. Nichols files this Complaint under 42 U.S.C. § 1983, alleging violations of his rights under the First, Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution, the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc-1 – 2000cc-5, and his statutory right to the assistance of counsel under 18 U.S.C. § 3599.

Mr. Nichols has a compelling interest in visitation with his spiritual advisor to assist him in preparing for death, as the United States Supreme Court has recently recognized in a case now pending before it on certiorari: *Gutierrez v. Saenz*, No. 19-8695, 2020 WL 3248349 (Jun. 16, 2020). He also has an interest in visiting friends and family. Because of the pandemic, visitation has been substantially restricted. The State does not have a compelling interest in executing Mr. Nichols

on August 4, during the pandemic, abrogating his statutory and constitutional rights.

Mr. Nichols also has a compelling interest in seeking clemency. The District Attorney General who originally procured his death sentence now believes justice would be best served with a sentence of life in prison without parole, but the state court would not approve an agreement to this effect. In federal habeas proceedings, the district court found the unpresented mitigation evidence in Mr. Nichols case "a very compelling argument designed to persuade a jury to spare petitioner's life[.]" *Nichols v. Bell*, 440 F.Supp.2d 730, 789 n.21 (E.D. Tenn. Jul. 25, 2006). A different court, a three-judge panel of the Sixth Circuit Court of Appeals, found: "By any measure, Wayne Nichols had an oppressive and forlorn childhood, due to his father's abuse, his mother's illness, their poverty, and the church-dominated society into which he was born." *Nichols v. Heidle*, 725 F.3d 516, 520 (6th Cir. 2013). The federal courts were restricted from granting relief because of procedural bars, and this is a sufficient basis for the Governor to exercise the clemency power. Finally, even without knowledge of the "very compelling" mitigation evidence that was presented to the federal courts, on direct appeal review Chief Justice Reid dissented from the imposition of death, finding Mr. Nichols is not among the "worst of the worst" who are deserving of the death penalty, because he suffers significant emotional and mental problems. *State v. Nichols*, 877 S.W.2d 722, 744-45 (Tenn. 1994). Due to the pandemic, counsel have not been able to conduct the necessary field work and investigation to prepare a clemency application.

Mr. Nichols has a constitutional right to visitation with his spiritual advisor, and friends and family, to prepare for clemency unencumbered by the unique and unprecedented obstacles created by the pandemic, and to the assistance of counsel during these last months of his life. In order to give meaning to these significant rights, the August 4, 2020 execution date must be stayed.

## Incorporation of Allegations

All allegations in this Complaint and the attached Exhibits are incorporated in all sections as if fully set forth therein.

## Parties

1.     Plaintiff is Tennessee death row prisoner Harold Wayne Nichols, who was convicted of capital murder and sentenced to death on May 12, 1990. Mr. Nichols is currently incarcerated in this District at Riverbend Maximum Security Institution, Nashville, Davidson County, Tennessee (hereinafter, "RMSI"), and is in the custody of the Tennessee Department of Correction. Mr. Nichols' execution date was set by Defendants Justices of the Tennessee Supreme Court on January 15, 2020. Mr. Nichols is scheduled for execution on August 4, 2020.

2.     Defendant Tony Parker is the Commissioner of the Tennessee Department of Correction ("TDOC"), the state agency located in Nashville, Tennessee, that will carry out the August 4, 2020 execution date challenged in this Complaint. Plaintiff sues Commissioner Parker in his official capacity. Defendant Parker will oversee the administration of Plaintiff's execution at RMSI. Defendant Parker is a state actor acting under color of state law, and his actions in seeking to execute and/or in executing Plaintiff on August 4, 2020, violate Plaintiff's

constitutional and statutory rights, described herein. Mr. Parker's actions in overseeing the failure to disclose practice, policy and procedure and/or overseeing implementation of arbitrary rules also violate Plaintiff's constitutional and statutory rights as described herein.

3.     Defendant Tony Mays is the Warden of RMSI, where Plaintiff is held in custody under sentence of death and where Plaintiff's execution will occur. Plaintiff sues Mr. Mays in his official capacity. Defendant Mays is directly in charge of Plaintiff's execution at RMSI, as well as the visitation policy implemented in light of COVID-19. Defendant Mays is a state actor acting under color of state law, and his actions in seeking to execute and/or executing Plaintiff on August 4, 2020, violate Plaintiff's constitutional and statutory rights, as described herein. Mr. Mays' actions in overseeing the failure to disclose practice, policy and procedure and/or overseeing implementation of arbitrary rules also violate Plaintiff's constitutional and statutory rights as described herein.

4.     Defendants John and Jane Does TDOC employees assist in creating, advising, drafting, and implementing practice, policy, and procedures related to visitation and carrying out executions in Tennessee at RMSI. Defendants John and Jane Does TDOC employees are state actors acting under color of state law, and their participation in refusing to disclose practice, policy and procedures and/or implementing arbitrary rules violate Plaintiff's constitutional and statutory rights, as described herein. Plaintiff sues John and Jane Does TDOC employees in their official capacity.

5. Defendant Herbert Slatery III is the Attorney General of the State of Tennessee, and his office is responsible for requesting Mr. Nichols' execution date be set. Plaintiff sues Mr. Slatery in his official capacity. Furthermore, Defendant Slatery's office has been actively opposing Plaintiff's attempts to have his execution date stayed and reset in the Tennessee Supreme Court and is independently capable of moving to withdraw the execution date in light of the extraordinary circumstances created by the COVID-19 pandemic. Defendant Slatery is a state actor acting under color of state law, and his actions in seeking to execute Plaintiff on August 4, 2020 violate Plaintiff's constitutional and statutory rights, as described herein.

6. Defendants Justices of the Tennessee Supreme Court, Jeffrey S. Bivens, Cornelia A. Clark, Holly Kirby, Sharon G. Lee, and Roger A. Payne, acting in their official capacity, scheduled Plaintiff's execution for August 4, 2020. Plaintiff sues Defendants Justices of the Tennessee Supreme Court in their official capacity. They subsequently granted motions to reschedule dates for inmates similarly situated to Mr. Nichols but twice refused to grant Mr. Nichols' motions to reschedule his execution date. In setting Mr. Nichols' August 4 execution date, and in refusing to move Mr. Nichols' date but moving dates before and after Mr. Nichols, Defendants Justices of the Tennessee Supreme Court are state actors acting under color of state law, and their actions violate Plaintiff's constitutional and statutory rights as described herein.

## Jurisdiction and Venue

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), § 2201 (declaratory relief), and § 2202 (further relief). This action arises under the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc-1 – 2000cc-5, 18 U.S.C. § 3599, and 42 U.S.C. § 1983.

8. Defendants are responsible for scheduling, overseeing, carrying out, and defending Plaintiff's August 4, 2020 execution scheduled at RMSI in Nashville, Tennessee, where this Court is located. They are also responsible for implementing visitation policies and communicating policies related to the mitigation of COVID-19 to Plaintiff and the public, as well as for communicating how TDOC intends to carry out an execution during the pandemic.

9. As to exhaustion of administrative remedies, Mr. Nichols acting *pro se* timely filed grievances at RMSI concerning the restriction of his constitutional and statutory rights based on the denial and restriction imposed on visitation with attorneys, family, and religious advisors, as well as the infringement of his free exercise and religious rights. The prison has not addressed these grievances to-date.

10. There is no administrative remedy available to seek exhaustion of the claims regarding the violation of Mr. Nichols' rights under the Eighth Amendment or Fourteenth Amendment or the deprivation of his rights in clemency or to clemency counsel. Mr. Nichols has already unsuccessfully raised these issues

before the state court and with the prison directly. These issues are properly raised here.

11.     Plaintiff does not concede a need to exhaust or engage in further or additional administrative remedies because any administrative process is either unavailable to provide the relief sought herein, or futile.

## I.     Factual Allegations

## Introduction

12.     On January 15, 2020, Defendants Justices of the Tennessee Supreme Court set Mr. Nichols' execution date for August 4, 2020.

13.     Soon after, the COVID-19 pandemic seized the country and several emergency measures were enacted, including for the first time in Tennessee's modern death penalty era, an executive order directing non-essential workers to stay at home; the closure of the state and federal courthouses; the issuance of emergency court orders governing and limiting proceedings in both federal and state courts; and the implementation by Federal Defender Services of Eastern Tennessee, Inc. ("FDSET") of mandatory teleworking and mandatory restrictions on travel and field work.

14.     The global pandemic has exerted extraordinary influence on all aspects of legal representation during the warrant period and on the ability of the prison to manage safety and health concerns.

7

**COVID-19 has created states of emergency and upended functioning of the courts and their participants**

15. The novel coronavirus, SARS-CoV-2 or "COVID-19," is unprecedented for its level of dangerousness.

16. As of this filing, there are almost 2.5 million[1] confirmed cases of people with COVID-19 in the United States and 126,739[2] people have died from the disease—a death toll that has far surpassed that of the severe acute respiratory syndrome (SARS) epidemic that occurred in 2002 and 2003. COVID-19 is a new type of coronavirus; "a virus that scientists haven't seen before."[3] In Tennessee, there are currently 42,297[4] confirmed cases and 592[5] deaths.

17. Davidson County, where Mr. Nichols is housed, is one of Tennessee's hardest hit areas, and as of June 29, 2020, face coverings in public are mandatory.[6]

18. Scientists are trying to determine how the virus is transmitted between people and to better understand the pathogenesis of the infection and resulting inflammatory response.

---

[1] CDC, *Coronavirus Disease 2019 (COVID-19) Cases in the U.S.,* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Jun. 30, 2020).
[2] *Id.*
[3] Kathy Katella, *5 Things Everyone Should Know About the Coronavirus Outbreak,* Yale Medicine (updated Jun. 30, 2020), https://www.yalemedicine.org/stories/2019-novel-coronavirus/ (last visited Jun. 30, 2020).
[4] Tennessee Department of Health Coronavirus Disease (COVID-19) Data, https://www.tn.gov/health/cedep/ncov.html (last visited Jun. 30, 2020).
[5] *Id.*
[6] Coll. Exh. 22, Health Director Order 8: Cloth Face Coverings or Masks Order, https://www.nashville.gov/Metro-Clerk/Legal-Resources/Emergency-Health-Orders/Order-8.aspx (last visited Jun. 30, 2020).

19.    COVID-19 is unique because patients can have high viral loads even without fever or with mild symptoms.[7]

20.    This means the virus remains for a longer period of time and infected individuals with no or only mild symptoms can release and spread the virus to others.[8]

21.    COVID-19 is causing more infections and deaths than either SARS or MERS.[9]

22.    COVID-19 affects the respiratory tract and can lead to pneumonia, respiratory failure, septic shock, and death.[10]

23.    The median time from first symptom to dyspnea has been measured at 5.0 days, the median time to hospital admission is 7.0 days, and the median time to acute respiratory distress syndrome is 8.0 days.[11]

24.    Scientists have found that COVID-19 can cause the blood to clot in unusual ways and it appears to be causing sudden strokes in adults in their 30s and 40s who are not otherwise terribly ill.[12]

---

[7]Yixuan Wang, *et. al.*, *Unique epidemiological and clinical features of the emerging 2019 novel coronavirus pneumonia (COVID-19) implicate special control measures*, 92 J. Med. Virology 568, 571 (Feb. 24, 2020). https://onlinelibrary.wiley.com/doi/epdf/10.1002/jmv.25748
[8] *Id.* at 574.
[9] *Id.*
[10] *Coronavirus and COVID-19: What You Should Know*, https://www.webmd.com/lung/coronavirus
[11] Wang, *supra* at 571.
[12] Maggie Fox, *Covid-19 causes sudden strokes in young adults, doctors* say, (April 23, 2020) https://www.cnn.com/2020/04/22/health/strokes-coronavirus-young-adults/index.html

25.     About 36% of persons with COVID-19 suffer neurological manifestations early in the illness.[13]

26.     No pharmaceutical products have yet been recommended as safe and effective treatments for COVID-19.[14]

27.     On January 30, 2020, the World Health Organization declared the yet-to-be-named COVID-19 virus outbreak a Public Health Emergency of International Concern.[15]

28.     The COVID-19 outbreak was declared a pandemic on March 11, 2020.[16]

## Numerous State and National Executive and Judicial Emergency Orders Have Issued

29.     On March 13, 2020, President Trump declared a national emergency, beginning March 1, 2020.[17]

---

[13] Ling Mao, *Neurologic Manifestations of Hospitalized Patients with Coronavirus Disease 2019, Wuhan, China*, JAMA Neurol. Published online April 10, 2020, https://jamanetwork.com/journals/jamaneurology/fullarticle/2764549
[14] Kathy Katella*, 5 Things Everyone Should Know About the Coronavirus Outbreak*, (Jun. 30, 2020) https://www.yalemedicine.org/stories/2019-novel-coronavirus/
[15] World Health Organization, *Rolling updates on coronavirus disease (COVID-19)* (Updated Jun. 17, 2020) https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (last visited Jun. 30, 2020).
[16] World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19*, https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020
[17] Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, issued Mar. 13, 2020, https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/

10

30.    On March 12, 2020 Governor Lee declared a state of emergency in Tennessee.[18] (Exh. 1, Executive Order 14).

31.    Also on March 12, 2020, without notice, RMSI suspended all visitation to prisons in the state, including legal visits and visits with spiritual advisers, to protect what it considers to be a "vulnerable population."[19]

32.    The prison has written visitation policies. (Exh. 18, Visitation Policy Index #507.01; Exh. 19, Attorney Access to Inmates Policy Index #105.09).

33.    The suspension of visitation is inconsistent with those policies.

34.    Governor Lee also issued an executive order requiring Tennesseans to stay at home through April 30, 2020, unless engaging in essential services or essential activities. (Exh. 2, Executive Order No. 23).[20]

35.    On May 12, 2020, Governor Bill Lee extended the State of Emergency in Tennessee through June 30, 2020. (Exh. 3, Executive Order No. 36).

36.    On June 29, 2020, Governor Lee extended the State of Emergency to August 28, 2020. (Coll. Exh. 22, Executive Order No. 50).

37.    In March, April, and May of 2020, the Tennessee Supreme Court issued a series of orders declaring a judicial emergency and that COVID-19 is a disaster and modifying court operations. (Exh. 4, Order Suspending In-Person

---

[18] Governor Lee Executive Order 14, https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee14.pdf
[19] Tennessee Department of Correction, *TDOC Visitation Suspended Until Further Notice*, https://www.tn.gov/correction/news/2020/3/12/tdoc-visitation-suspended-until-further-notice.html
[20] Governor Lee Executive Order No. 23, https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee23.pdf

Proceedings (Tenn. Mar. 13, 2020); Exh. 5, Order Continuing Suspension of In-Person Court Proceedings and Extension of Deadlines (Tenn. Mar. 25, 2020); Exh. 6, Order Modifying Suspension of In-Person Court Proceedings and Further Extension of Deadlines (Tenn. Apr. 24, 2020); Exh. 7, Order Extending State of Emergency and Easing Suspension of In-Person Court Proceedings (Tenn. May 26, 2020)).

38.     On March 13, 2020, the Tennessee Supreme Court issued an emergency order closing courthouses, suspending in-person matters except for emergency matters related to physical or mental health, and directing that, when possible, legal and clerical matters were to be conducted remotely. (Exh. 4, Order Suspending In-Person Proceedings).

39.     On March 25, 2020, the Tennessee Supreme Court issued an order extending the closure of the courthouses and suspension of in-person matters. The order clarified that COVID-19 qualified as a "disaster" under Tennessee law. (Exh. 5, Order Continuing Suspension of In-Person Court Proceedings and Extension of Deadlines).

40.     The order directed that notaries could work remotely and that evictions were suspended. (Exh. 5, p.3)

41.     On April 24, 2020, the Tennessee Supreme Court extended the suspension of jury trials until July 3, 2020, encouraged the continuation of working remotely and invited courts to submit plans for returning to "normal" operations in

a safe manner. (Exh. 6, Order Modifying Suspension of In-Person Court Proceedings and Further Extension of Deadlines).

42.     On May 26, 2020, the Tennessee Supreme Court extended the cessation of jury trials until July 3, 2020 and noted its intention that restrictions on in-court proceedings would be gradually limited. (Exh. 7, Order Extending State of Emergency and Easing Suspension of In-Person Court Proceedings).

43.     These orders also generally comment on the judiciary's obligation to reduce the health risks associated with COVID-19 and state that the orders are to be interpreted broadly to protect the public from the risks associated with COVID-19. (Exh. 4, Exh. 5, Exh. 6, Exh. 7).

44.     The federal courts have similarly operated on judicial emergency contingency plans.

45.     The United States Supreme Court has closed its building to the public, postponed oral arguments, and *sua sponte* entered a general order extending the filing date for any petition for writ of certiorari and providing for extensions of other deadlines.[21] Order dated March 19, 2020.[22]

46.     "The Judicial Conference of the United States has [] found that emergency conditions due to the national emergency declared by the President have

---

[21] United States Supreme Court Press Release, Mar. 16, 2020 https://www.supremecourt.gov/publicinfo/press/pressreleases/pr_03-16-20; United States Supreme Court Press Release, Apr. 3, 2020 https://www.supremecourt.gov/publicinfo/press/pressreleases/pr_04-03-20
[22] Order 589 U.S. ___ (Mar. 19, 2020) https://www.supremecourt.gov/orders/courtorders/031920zr_d1o3.pdf

affected and will materially affect the functioning of the federal courts generally." *In re: Authorization for Video and Audio teleconferencing During COVID-19 Pandemic Pursuant to the CARES Act*, No. SO-20-08, p. 1 (E.D. Tenn. March 30, 2020).

47.     The Federal District Court for the Eastern District of Tennessee, where Mr. Nichols' conviction is based, suspended many in-person proceedings through May 4, 2020, including grand jury proceedings. *In re: Court Operations under the Exigent Circumstances Created by COVID-19*, No. SO-20-06, No. SO-20-09 and No. SO-20-11. Suspension of in-person proceedings was continued through May 30, 2020. *In re: Extensions of Time Set Forth in SO-20-06 and SO-20-09 Regarding Court Operations Under The Exigent Circumstances Created By Covid-19*, No. SO-20-12. On May 29, 2020, the court issued a standing order that the grand jury would convene as directed and jury trials would be continued past June 14, 2020. *In re: Court Operations under the Exigent Circumstances Created by Covid-19*, No. SO-20-13.

48.     The court has found that felony pleas and sentencing "cannot be conducted in person in this district without seriously jeopardizing public health and safety." *In re: Authorization for Video and Audio teleconferencing During COVID-19 Pandemic Pursuant to the CARES Act*, No. SO-20-08, p. 2 (E.D. Tenn. Mar. 30, 2020). On June 22, 2020, the court noted emergency conditions continued and provisions of the CARES Act would remain in effect until at least September 26, 2020. *In re: Extension of Authorization for Video and Audio teleconferencing During COVID-19 Pandemic Pursuant to the CARES Act*, No. SO-20-14.

49.     On March 23, 2010, this Court entered Administrative Order 209 noting the seriousness of the COVID outbreak and the need for special measures and suspended criminal trials and grand jury proceedings.

50.     On April 29, 2020, this court entered Second Amended Administrative Order 209 extending the cessation of criminal trials and grand jury proceedings. This Court explained the public health emergency necessitated that people stay at home unless absolutely necessary.

51.     On May 30, 2020, this Court extended the cessation of criminal trials and grand jury proceedings through the end of June 2020. Third Amended Administrative Order 209.

52.     The State of Texas has now stayed five executions in light of COVID-19.[23]

53.     The only state to carry out an execution during the pandemic, Missouri, is now reporting multiple COVID-19 penal outbreaks, including in the prison at Bonne Terre where the execution took place.[24]

---

[23] AP, *Fifth Texas Execution Delayed in Midst of Virus Outbreak*, Apr. 18, 2020 https://www.nbcdfw.com/news/coronavirus/fifth-texas-execution-delayed-in-midst-of-virus-outbreak/2353815/.

[24] *See* Alisa Nelson, *BREAKING: Missouri becomes first state to execute a prisoner during coronavirus outbreak*, May 19, 2020 https://www.missourinet.com/2020/05/19/breaking-missouri-becomes-first-state-to-execute-a-prisoner-during-coronavirus-outbreak/ and Dan Greenwald, *COVID-19 outbreak reported at prison in Bonne Terre, Mo.*, Jun. 19, 2020 https://www.kmov.com/news/covid-19-outbreak-reported-at-prison-in-bonne-terre-mo/article_f7851c40-b25f-11ea-a0d3-83a31be98b0a.html.

54. Prior to the May 19, 2020 execution carried out in Missouri, the facility reported no COVID-19 cases. Now, roughly one month later, the prison facility is reporting 60 cases and counting. (Exh. 8, June 28, 2020 Aronoff Decl. ¶9).

## Counsel have significant obligations and duties when an execution date has been set

## Appointment Under 18 U.S.C. § 3599

55. On October 29, 2002, the District Court for the Eastern District of Tennessee, pursuant to 21 U.S.C. § 848(q)(4)(B) (re-codified verbatim in 18 U.S.C. § 3599(a)(2)), appointed FDSET to represent Harold Wayne Nichols in federal habeas proceedings and other authorized purposes.

56. 18 U.S.C. § 3599 (a)(2) provides in relevant part:

> In any post conviction proceeding under section 2254 or 2255 of title 28, United States Code, seeking to vacate or set aside a death sentence, any defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with subsections (b) through (f).

57. Included within subsections (b) through (f) of 18 U.S.C. § 3599 is also subsection (e), which provides the following:

> Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, *each attorney so appointed shall represent the defendant throughout every subsequent stage of available judicial proceedings, including* pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and *all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also*

16

> *represent the defendant in such competency proceedings and proceedings for executive or other clemency* as may be available to the defendant.

18 U.S.C. § 3599(e) (emphasis added).

58.     In 2009, the United States Supreme Court in *Harbison v. Bell* affirmed that the language quoted above entitled attorneys appointed under this statute to represent their clients not only in federal habeas corpus and related proceedings, but also in state clemency proceedings. *Harbison v. Bell*, 556 U.S. 180 (2009).

59.     The Court concluded, "[t]hus, once federally funded counsel is appointed to represent a state prisoner in § 2254 proceedings, she 'shall also represent the defendant in such . . . proceedings for executive or other clemency as may be available to the defendant.' § 3599(e). Because state clemency proceedings are 'available' to state petitioners who obtain representation pursuant to subsection (a)(2), the statutory language indicates that appointed counsel's authorized representation includes such proceedings." *Harbison*, 556 U.S. at 185-86.

### Standards Governing Death Penalty Representation

60.     Counsel representation in death penalty cases is governed by well-established norms and standards.

61.     These standards "include the American Bar Association ("ABA") Standards for Criminal Justice, the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, ("ABA Guidelines"), the ABA Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases ("Supplementary Guidelines"), the National Legal Aid and Defender Association ("NLADA") Performance Guidelines for Criminal Defense

17

Representation, and the NLADA Standards for the Appointment and Performance of Counsel in Death Penalty Cases." (Exh. 9, Wright Decl. ¶3; Exh. 10, Chavis Decl. ¶6).

62.    These standards and norms apply to every stage of a death penalty case and failing to represent a death-sentenced prisoner in accordance with these standards can constitute a violation of the attorney's ethical and professional responsibilities. (Exh. 9, Wright Decl. ¶4 (citing the Supplementary Guidelines)).

63.    Specific Guidelines applicable to when an execution date has been set include:

   a.   ABA Guideline 10.15.1(B): "If an execution date is set, post-conviction counsel should immediately take all appropriate steps to secure a stay of execution and pursue those efforts through all available fora[;]"

   b.   NLADA Standard 11.9.5(b): "Counsel should take immediate steps to seek a stay of execution, and to appeal from any denial of a stay, in any and all available courts when an execution date is set. (c) Counsel should continually monitor the client's mental, physical and emotional condition to determine whether any deterioration in the client's condition warrants legal action[;]" and

   c.   ABA Guideline 10.15.2: "Clemency counsel should ensure that clemency is sought in as timely and persuasive a manner as possible…. D. Clemency counsel should ensure that the process

governing consideration of the client's application is substantively

and procedurally just, and, if it is not, should seek appropriate

redress."

(Exh. 9, Wright Decl. ¶¶4-6 (quoting ABA Guideline 10.15.1(B); NLADA Standard

11.9.5(b); ABA Guideline 10.15.2)).

64.     ABA Guideline 10.7, which governs the investigation to be conducted

under Guidelines 10.15.1 and 10.15.2, requires counsel at every stage to investigate

(1) medical history, including hospitalizations, mental and physical illness or injury,

alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental

delays, and neurological damage; (2) family and social history; (3) educational

history; (4) military service; (5) employment and training history; and (6) prior

juvenile and adult correctional experience.[25]

65.     The United States Supreme Court and the Sixth Circuit opine that the

ABA standards for counsel in death penalty cases are indicia of professional norms.

*Wiggins v. Smith*, 539 U.S. 510 (2003); *Mason v. Mitchell*, 543 F.3d 766, 775 (6th

Cir. 2008); *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003).

66.     Within the Federal Defender Offices in the Sixth Circuit, including

FDSET, the following practices are considered the baseline duties for the ethical

and professional representation of a capital prisoner in clemency:

---

[25] *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, Guideline 10.7, Commentary, 31 Hofstra Law Rev. 913, 1022-23 (rev. ed. 2003).

a. Reviewing everything in the case file and the entire case history to identify salient themes for the clemency presentation;

b. Completing a thorough independent investigation into the client in accordance with ABA Guideline 10.7, including social psychological background and history reaching back several generations;

c. Completing a thorough independent investigation into the crime and all facets of the trial, sentencing, appeal, post-conviction and federal habeas stages;

d. Obtaining all records relating to the client and his family, [including] educational, employment, military, criminal history, prison, medical, mental health, social security, children's services', religious, etc.; and

e. Interviewing jurors and/or relatives of the victim[s] to the crime.

(Exh. 9, Wright Decl. ¶¶12-23; Exh. 10, Chavis Decl. ¶¶ 12-15).

67.   Prevailing professional norms dictate that all of the interviews described above be conducted in person.

68.   "All interviews with the client and potential witnesses in support of clemency must be in person, face-to-face, one-on-one interviews. This is necessary for two reasons. First, in order to receive accurate information in an interview, the interviewer must build a rapport with the witness. […] The second reason for requiring in person, face-to-face interviews with all witnesses is that the team must

gauge how best to present information to the relevant decision maker." (Exh. 9, Wright Decl. ¶¶18-19).

69.    "In-person interviews are essential during the clemency investigation. One-on-one interaction is required to establish effective relationships and to determine how to effectively utilize witnesses and clemency supporters. Of course people cannot be interviewed without the legal team being able to locate and find them; sometimes this requires field work and on the ground searches." (Exh. 10, Chavis Decl. ¶15).

70.    In addition to the professional obligations governing counsel's responsibility to investigate avenues for clemency and press legal claims, counsel has an ongoing obligation to consult with her client and ensure that his interests are being protected and advocated for up until the time of the execution.

71.    "Frequent client visits at the execution-date stage of a case are uniquely critical because we must spend a significant amount of time counseling the client on emotionally sensitive issues including: the client's rights to visitation with family, friends, and religious advisers and assisting the client with exercising those rights; decisions the client must make under the execution protocol such as choosing a method of execution and designating a spiritual adviser and defense attorney witness; the nature of the execution protocol and what to expect during an execution; end-of-life decisions such as final wishes and directives regarding personal property, autopsy, and burial." (Exh. 10, Chavis Decl. ¶9).

72.     Frequent in-person conversations are important to discover information relevant to clemency such as the client's recent community involvement, his achievements or contributions within the prison, and his support system both inside and outside the prison." (Exh. 10, Chavis Decl. ¶9).

73.     Regular and unimpeded contact with clients in capital cases is also essential because "[m]any clients suffer from mental illness," and "[t]hese clients often become more anxious, agitated or even psychotic as clemency proceedings progress." (Exh. 9, Wright Decl. ¶25).

74.     Client access is therefore necessary for attorneys to be able to effectuate their duties under 18 U.S.C. §3599(e) to raise competency challenges, where appropriate, as well as to be able to effectively pursue executive clemency.

### Clemency Power in Tennessee

75.     In Tennessee, art. III, § 6 of the Tennessee Constitution vests the governor with broad power to "grant reprieves and pardons, after conviction, except in cases of impeachment."

76.     There are no limitations on the reasons for which, or the cases in which—other than impeachment—the Tennessee governor may grant clemency.

77.     The only statutory constraint on the governor's clemency power is found in Tenn. Code Ann. § 40-27-107, modified in 2011, which provides:

> [t]he governor shall cause to be entered, in a book kept for that purpose, any reasons for granting pardons or commuting punishment, and preserve on file all documents on which the governor acted, and submit the same to the general assembly when requested.

78.     Additionally, before the intention to grant clemency is made public, "the governor shall notify or cause to be notified the attorney general and reporter and the district attorney general of the judicial district in which the conviction occurred of the impending clemency action." Tenn. Code Ann. § 40-27-110(b).

79.     Finally, only in cases where clemency is to be granted, "[p]rior to notice of the clemency action being made public, the district attorney general, through the victim-witness coordinator, shall notify the victim or victims of the offense for which the person is receiving clemency, or the victim's representative, of the impending grant of clemency." Tenn. Code Ann. § 40-27-110(c)(1).

80.     Since the death penalty was reinstated in Tennessee in 1976, three death-sentenced prisoners have been granted clemency.

81.     These are Michael Boyd, whom former Governor Phil Bredesen granted clemency in 2007, citing ineffective legal counsel and procedural limitations on appeal;[26] Gaile Owens, whom Governor Bredesen concluded showed signs of battered women's syndrome and was treated unfairly by the legal system;[27] and Edward Jerome Harbison, whose case Governor Bredesen concluded did not rise to the level of the "worst of the worst" necessitating the ultimate punishment.[28]

---

[26] *List of Clemencies since 1976*, Death Penalty Information Center, https://deathpenaltyinfo.org/facts-and-research/clemency/list-of-clemencies-since-1976 (last visited Jun. 30, 2020).

[27] *Tennessee Governor Commutes Death Sentence of Gaile Owens*, Death Penalty Information Center (July 14, 2010), https://deathpenaltyinfo.org/news/tennessee-governor-commutes-death-sentence-of-gaile-owens

[28] *Bredesen commutes death sentence, pardons 22*, The Kingsport Times-News (Jan. 12, 2011),

82.     Altogether, 13 prisoners have been executed in Tennessee since 1960—seven of whom have been executed in the last two years.[29]

83.     Overall, at a rate of three clemencies per 16 executions, Tennessee grants clemency in about 18% of cases.

84.     Under Governor Bill Lee, four prisoners have been executed.

85.     So far, none have been granted clemency.

86.     Governor Lee has stated that in considering clemency decisions, he will "take in all of the information that is available to [him] and consider all of it, consider victims, consider justice, consider the crime itself, consider the verdict of the jury and the makeup of the court."[30]

87.     Governor Lee also stated that in reaching a clemency decision in a death penalty case, he consults with "a close circle, including his wife, pastor, and close friends." *Id.*

88.     In cases outside of Tennessee where clemency has been granted, investigation into the viewpoints of jurors and victim family members' on whether the execution should take place has proven essential. (Exh. 9, Wright Decl. ¶¶ 27-28).

http://www.timesnews.net/News/2011/01/12/Bredesen-commutes-death-sentence-pardons-22

[29] Tennessee Department of Corrections, Tennessee Executions, https://www.tn.gov/correction/statistics-and-information/executions/tennessee-executions.html

[30] Kimberlee Kruesi and Jonathan Mattise, *AP Interview: Tennessee governor talks death penalty, faith* (Dec. 22, 2019), https://apnews.com/4932e5fe21d35d1be221169596f5ec8a

89.     This type of investigative work is also considered an essential part of the clemency investigation within Tennessee. (Exh. 10, Chavis Decl. ¶15) ("For example, we know from prior experience in Mr. Nichols' case that meaningful interaction with former prosecutors, jurors, and corrections staff produced beneficial information. But in the past not all jurors were located or interviewed, so that work must now be done.")

**The global pandemic has prevented counsel from performing essential tasks in the months prior to the execution**

**Relevant Counsel and COVID-19 Chronology**

90.     On January 15, 2020, when Defendants Justices of the Tennessee Supreme Court set Mr. Nichols' execution date for August 4, 2020, attorneys from FDSET were actively involved in the representation of two other clients facing execution. (Exh. 10, Chavis Decl. ¶20).

91.     FDSET client Nicholas Sutton was executed on February 20, 2020. (Exh. 10, Chavis Decl. ¶26).

92.     FDSET client Gregory Lott was scheduled for execution in Ohio on March 12, 2020. (Exh. 10, Chavis Decl. ¶20).

93.     The FDSET CHU is comprised of four attorneys, four paralegals, and two investigators. (Exh. 10, Chavis Decl. ¶7).

94.     Every case is assigned two attorneys, a paralegal and an investigator. (Exh. 10, Chavis Decl. ¶7).

95. When a FDSET CHU client receives an execution date, normal practice dictates that all CHU staff assist as needed in litigation and duties related to seeking to stay the execution. (Exh. 10, Chavis Decl. ¶7).

96. On January 28, 2020, counsel submitted a clemency application on behalf of Mr. Lott.

97. On January 31, 2020, Mr. Lott's execution was reprieved by Ohio Governor Mike DeWine due to the state's inability to procure the lethal injection drugs. (Exh. 10, Chavis Decl. ¶25).

98. Prior to receiving news of the reprieve, FDSET counsel filed a motion on Mr. Lott's behalf seeking relief from judgment based on a retroactive change in law. (Exh. 10, Chavis Decl. ¶25).

99. Despite the reprieve granted Mr. Lott, the clemency process related to his case continued under the following deadlines:

- the State files a response to the clemency application on February 5, 2020;

- the client appears before the Board for an interview on February 6, 2020;

- counsel present evidence and argument at an in-person hearing before the Ohio Parole Board on February 11, 2020.

(Exh. 10, Chavis Decl. ¶21).

100.    In addition, on February 13, 2020, FDSET counsel filed a supplement for Mr. Lott addressing issues that came up during the February 11, 2020 Parole Board hearing in Ohio. (Exh. 10, Chavis Decl. ¶22).

101.    On March 30, 2020, the State submitted a supplement in response, and on March 31, 2020, a reply was submitted on behalf of Mr. Lott. (Exh. 10, Chavis Decl. ¶22).

102.    On May 1, 2020, the Board recommended that the Governor grant clemency. (Exh. 10, Chavis Decl. ¶22).

103.    The clemency grant in Ohio came after counsel was able to present evidence of "statements from the victim's family members and an in-person interview with the victim's priest demonstrating that the death penalty is against their devout religious beliefs, and they did not want a human being killed in their family's name. Other persuasive evidence [that] was presented during the clemency hearing [included findings] by a psychological expert and an academic who highlighted racial disparities in the death penalty's application in Ohio." (Exh. 10, Chavis Decl. ¶22).

104.    The work that led to a clemency recommendation in Mr. Lott's case is "not … possible in the current COVID-19 environment." (Exh. 10, Chavis Decl. ¶22).

105.    After Mr. Nichols' execution date was set on January 15, FDSET counsel and an investigator scheduled a legal visit with him at RMSI for January 24, 2020. (Exh. 10, Chavis Decl. ¶23).

106. The January 24 legal visit was cancelled because the prison for reasons not disclosed had gone on lockdown. (Exh. 10, Chavis Decl. ¶23).

107. The following week, another FDSET attorney was able to visit with Mr. Nichols to explain the setting of the execution date, provide an overview of upcoming litigation and discuss the clemency process in Tennessee. (Exh. 10, Chavis Decl. ¶23).

108. Throughout February, FDSET counsel remained actively pursuing clemency in Tennessee for client Nicholas Sutton, and preparing for the clemency process in Ohio outlined above for Mr. Lott. (Exh. 10, Chavis Decl. ¶¶20-22).

109. Additionally, on February 25, 2020, FDSET lead counsel for Mr. Nichols filed a brief in the Sixth Circuit Court of Appeals on behalf of a client in another case; and on March 12, 2020, FDSET counsel for Mr. Nichols filed a brief in the Fourth Circuit Court of Appeals for yet another client. (Exh. 10, Chavis Decl. ¶27).

110. Around the same time as state and national emergencies were declared, on March 16, 2020, FDSET invoked a continuity of operations plan mandating telework for all employees and prohibiting all work-related travel. (Exh. 10, Chavis Decl. ¶32).

111. On March 19, 2020, given RMSI's suspension of all visitation including legal visitation, the FDSET investigator assigned to Mr. Nichols' case scheduled a legal phone call so that Mr. Nichols would be able to call him, but that call never came. (Exh. 10, Chavis Decl. ¶34).

112.    The investigator then requested a legal visit with Mr. Nichols for the following week. The legal visit was denied and instead a phone call was arranged and took place. (Exh. 10, Chavis Decl. ¶34).

113.    Mr. Nichols' investigator had travel reservations for an investigatory trip to two different states scheduled for the week of March 25, 2020, to meet with members of Mr. Nichols' family: his sister and his daughter. (Exh. 10, Chavis Decl. ¶35).

114.    Topics for investigation and discussion during that trip included the execution date, visitation with Mr. Nichols, and the family's relationship with Mr. Nichols. (Exh. 10, Chavis Decl. ¶35).

115.    Mr. Nichols' sister shared the same oppressive and abusive childhood which is relevant to Mr. Nichols' clemency request. (Exh. 10, Chavis Decl. ¶35).

116.    That investigatory trip and the interviews had to be cancelled because of FDSET's pandemic procedures. (Exh. 10, Chavis Decl. ¶35).

117.    On April 1, 2020, FDSET counsel for Mr. Nichols filed a petition for an original writ of habeas corpus in the United States Supreme Court. (Exh. 10, Chavis Decl. ¶36).

118.    During the month of April, counsel submitted several public record requests to various agencies to learn more about the governor's process for determining clemency, as prescribed by ABA Guideline 10.15.2. (Exh. 10, Chavis Decl. ¶¶41-42).

119.    On April 27, 2020, the Knox County District Attorney's Office, a respondent to one of the records requests, indicated that responses to the request would take longer on account of fewer staff in the office as a result of COVID-19. (Exh. 10, Chavis Decl. ¶42).

120.    To date, those records have not been produced. (Exh. 10, Chavis Decl. ¶42).

121.    On May 8, 2020, the Shelby County District Attorney's Office indicated that a response would take longer than the statutory period allotted due to COVID-19, and the fact that its office was in the process of moving. (Exh. 10, Chavis Decl. ¶47).

122.    In mid-June, around six weeks after the request was submitted, the Shelby County records were produced. (Exh. 10, Chavis Decl. ¶¶41-42).

123.    On April 28, 2020, FDSET received notice that mandatory telework and travel restrictions would remain in place through May 30, 2020. (Exh. 10, Chavis Decl. ¶43).

124.    On April 30, 2020, after the State of Tennessee had been under a stay-at-home order for a month, counsel for Mr. Nichols filed a motion for stay of execution in the Tennessee Supreme Court citing counsel's inability to properly represent Mr. Nichols due to COVID-19 and the risks inherent in proceeding with an execution during the pandemic. (Coll. Exh. 11, Stay Motion pp.3-21).

125.     The State filed a Response to this Motion on May 5, 2020, and Mr. Nichols filed a Reply to this Response on May 8, 2020. (Coll. Exh. 11, Response and Reply pp.29-41).

126.     On May 12, 2020, Mr. Nichols filed a supplement to the Stay Motion, with a declaration by Corrections Expert James Aiken speaking to the health and safety dangers involved in carrying out an execution during the COVID-19 pandemic. (Coll. Exh. 11, Aiken Decl. pp.42-51).

127.     Mr. Aiken discussed the adverse impact of a COVID-19 outbreak inside a prison, including an increased danger and risk of: loss of life, suffering, over-extending the medical system, reduction in work force availability, litigation, and straining the overall security of the prison operations. (Coll. Exh. 11, Aiken Decl. p.47 ¶11).

128.     On May 27, 2020, counsel for Mr. Nichols filed a second supplement containing the declaration of David M. Aronoff, M.D., who has cared for numerous COVID-19 patients over the last several months and who also opined against carrying out an execution in August 2020 because it increases risks to public health. (Coll. Exh. 11, Aronoff Decl. pp.52-63).

129.     Dr. Aronoff's declaration described how the virus can spread through RMSI in general and as a result of the execution, and then spread back into the community at large. He also expressed concerns that attempted precautions undertaken by the State of Missouri and its prison during the May 2020 execution

31

of Walter Barton were not available to the State of Tennessee and RMSI. (Coll. Exh. 11, Aronoff Decl. p.62).

130. FDSET counsel requested special permission to arrange a legal visit with Mr. Nichols the last week of May. (Exh. 10, Chavis Decl. ¶51).

131. On May 29, 2020, Defendant Warden Mays denied FDSET counsel a legal visit with Mr. Nichols. (Exh. 10, Chavis Decl. ¶52).

132. On May 29, 2020, the FDSET requested from TDOC and Defendant Mays access to public records regarding lethal injection, electrocution, the execution protocol and execution practice records. (Exh. 12, Records Request).

133. The records requested were assembled by June 8, 2020, but, contrary to Tennessee Public Records law, the records have not yet been produced. (Exh. 13, Email to Debbie Inglis dated June 23, 2020).

134. Throughout April, May, and June 2020, FDSET counsel and staff have sought to schedule phone calls with Mr. Nichols. (Exh. 10, Chavis Decl. ¶53).

135. Some of the calls did not occur. Some of the calls were cut-off after five minutes. (Exh. 10, Chavis Decl. ¶53).

136. Some lasted the allotted 30 minutes, but "the efficacy of the calls were affected by a time delay and echo effect." (Exh. 10, Chavis Decl. ¶53).

137. In addition, on a call scheduled with Mr. Nichols and counsel on June 22, a voice interrupted midway through the discussion of counsel's next visit with Mr. Nichols to question whether an in-person legal visit could in fact take place. (Exh. 10, Chavis Decl. ¶53).

138. Counsel had not been informed that anyone at the prison would be listening to the call scheduled with Mr. Nichols. (Exh. 10, Chavis Decl. ¶53).

139. On June 3, 2020, counsel submitted a third supplement in support, pointing to worsening COVID-19 conditions in Tennessee, despite the State's claim that "reopening" suggested conditions were improving, and also raising the difficulties the COVID-19 pandemic continued to impose on counsel's ability to represent Mr. Nichols in clemency and related proceedings, in particular, the prison's denial of legal visitation. (Exh. 10, Chavis Decl. ¶55).

140. On June 4, 2020, Defendants Justices of the Tennessee Supreme Court issued its Order denying the Stay Motion, stating that the Motion was denied "at this time." (Coll. Exh. 11, p.102).

141. The Order contained no legal analysis or reasoning. (*Id.*)

142. On June 6, 2020, Defendant Warden Mays informed FDSET counsel that a legal visit was approved for June 9, 2020, provided that counsel "wear masks at all times, submit to a temperature check, and answer health questions." (Exh. 10, Chavis Decl. ¶55, Attachment B thereto).

143. On June 9, 2020, counsel, Dana Chavis, and Mr. Nichols' investigator met in-person with Mr. Nichols for the first time since his execution date had been set on January 15, 2020. (Exh. 10, Chavis Decl. ¶58).

144. This visit took place in a non-contact room, which consisted "of two rooms, each room about the size of a large phone booth, with a window at about waist-height on the adjoining wall." (Exh. 10, Chavis Decl. 58).

33

145.    Communication in this non-contact room was difficult because there is no opening in the adjoining wall or window and people must speak at a loud volume in order to be heard. (Exh. 10, Chavis Decl. ¶58).

146.    In addition, counsel for Mr. Nichols was required to wear a mask at all times, impairing communication between counsel and Mr. Nichols and causing Mr. Nichols to have to ask counsel to repeat herself several time. (Exh. 10, Chavis Decl. ¶58).

147.    The June 9 visit took place in a room where, "[u]nlike [in] some other prison visitation rooms, there is no telephone or microphone to speak into and communicate with the client." As a result, "[t]here is no doubt that the corrections officer stationed just outside the room can hear the conversation." (Exh. 10, Chavis Decl. ¶58).

148.    During the June 9 visit, counsel learned that, as a result of the suspension of visitation, Mr. Nichols had been unable to meet with his spiritual advisor, J.R. Davis, for the duration of the time the prison had been closed. (Exh. 10, Chavis Decl. ¶61; Exh. 14. Davis Decl. ¶8).

149.    Counsel also learned that Mr. Nichols has been unable to participate in bible study groups, in which he was formerly an active participant, or otherwise engage in his religious practice given the COVID-19 restrictions. (Exh. 10, Chavis Decl. ¶61).

150.    After the June 9 visit with Mr. Nichols, FDSET counsel and an investigator were quarantined for ten days pursuant to FDSET policy. (Exh. 10, Chavis Decl. ¶60).

151.    On June 10, 2020, counsel for Mr. Nichols requested via email to Defendant Warden Mays at RMSI that in light of Mr. Nichols' August 4 execution date and the fact that he had been denied visitation with his spiritual advisor since at least March 2020, he be permitted to visit with Mr. Davis. (Exh. 10, Chavis Decl. ¶61 and Exh. 10 Att. C, p.20).

152.    Counsel requested the prison permit weekly visits with Mr. Davis until Mr. Nichols' scheduled execution date, as has been allowed for religious prisoners in the past in the lead-up to execution. (Exh. 10, Chavis Decl. ¶61 and Exh. 10 Att. C, p.20).

153.    That same day, RMSI informed counsel that "the request is not approved at this time," and that Defendant Warden Mays would advise counsel when visits could resume. (Exh. 10, Chavis Decl. ¶61 and Exh. 10 Att. C, p.20).

154.    On June 12, 2020, FDSET staff were notified that mandatory telework policies and travel restrictions would remain in effect through mid-July. (Exh. 10, Chavis Decl. ¶62).

155.    On June 12, 2020, Defendants Justices of the Tennessee Supreme Court granted a stay of execution to Byron Black, a Tennessee death row inmate whose execution originally had been set for October 8, 2020. The court reset Mr.

Black's execution date for <u>April 8, 2021</u>. (Coll. Exh. 16 p.43, Byron Black TSC Pleadings).

156.    On April 17, 2020, Defendants Justices of the Tennessee Supreme Court reset the execution of Oscar Smith, originally scheduled for June 4, 2020, for <u>February 4, 2021</u>. (Coll. Exh. 15, Oscar Smith TSC Pleadings p.43).

157.    Mr. Smith's motion also raised difficulties in completing competency testing and pursuing clemency in light of the COVID-19 pandemic. (Coll. Exh. 15 (Smith) pp.3-11; Coll. Exh. 16 (Black), pp.3-24).

158.    Inmates Smith and Black are both represented by Federal Defenders for the Middle District of Tennessee Capital Habeas Unit.

159.    On June 15, 2020, counsel for Mr. Nichols filed a "Renewed Motion to Reset the Execution Date Due to the COVID-19 Pandemic" in the Tennessee Supreme Court. (Coll. Exh.11, pp.103-09).

160.    On June 16, 2020, Ruben Gutierrez was scheduled for execution in Texas.

161.    Hours before he was set to be executed, the United States Supreme Court granted a stay pending a decision whether to grant certiorari in the case. *Gutierrez v. Saenz*, No. 19-8695, 2020 WL 3248349 (Jun. 16, 2020). (Exh. 17, *Gutierrez* Order).

162.    In his Petition for Writ of Certiorari, Mr. Gutierrez claimed a violation of his religious rights under the First Amendment and RLUIPA in light of Texas'

prohibition on spiritual advisers in the execution chamber. *Gutierrez v. Saenz*, No. 19-8695, Petition for Writ of Certiorari (Jun. 15, 2020).

163. The State filed its Response to Mr. Nichols' Renewed Motion on June 17, 2020, and Mr. Nichols filed his Reply to the State's Response on June 19. (Coll. Exh. 11, pp.118-23, 124-39).

164. In the June 19 Reply, counsel for Mr. Nichols pointed to Mr. Gutierrez's stay of execution and the deprivation of Mr. Nichols' religious exercise rights as further grounds on which the Defendants Justices of the Tennessee Supreme Court should reset the August 4 date. (Coll. Exh. 11, pp.133-36).

165. On June 22, 2020, the Tennessee Supreme Court denied Mr. Nichols' renewed motion without resolving the constitutional claims raised therein, giving rise to the present action. (Coll. Exh. 11, p.140).

166. On June 22, 2020, after Mr. Nichols' Renewed Motion for Stay was denied, FDSET counsel requested another legal visit be scheduled with Mr. Nichols at RMSI. (Exh. 10, Chavis Decl. ¶68).

167. On June 23, 2020, TDOC and Defendant Warden Mays informed counsel that a new policy was in effect requiring all legal visitors show a negative COVID-19 test administered in the last three weeks in order to visit the prison. (Exh. 10, Chavis Decl. ¶69 and Exh. 10 Att. D, p.24).

168. Upon counsel immediately requesting to see a copy of this policy, the prison deliberated for several hours and eventually reversed course, stating that the

legal visit would be allowed without evidence of a COVID-19 test. (Exh. 10, Chavis Decl. ¶69 and Exh. 10 Att. D, p.23).

169.    This visit was then scheduled for June 25, 2020. (Exh. 10, Chavis Decl. ¶70 and Exh. 10 Att. D, p.23).

### Defendants Warden Mays and Commissioner Parker, and Defendants John and Jane Does TDOC Employees have, without prior notice, changed visitation policies and procedures for friends, family, counsel, and spiritual advisors

170.    As previously discussed, on March 12, 2020, the Tennessee Department of Correction (hereinafter "TDOC") and Defendants Warden Mays and Commissioner Parker and Defendants John and Jane Does TDOC employees suspended all visitation, including for friends, family, and spiritual advisers.[31]

171.    Legal visits are also suspended, absent "special permission."[32]

172.    TDOC explained the suspension of visitation was necessary to "protect what we [the DOC] consider a vulnerable population."[33]

173.    These directives are inconsistent with TDOC's written visitation policy. *See* Visitation Policy Index #507.01 (Exh. 18) and Attorney Access to Inmates Policy Index #105.09 (Exh. 19).

---

[31] Anita Wadhwani, *Tennessee prisons suspend visitation, volunteers until further notice* (Mar. 12, 2020), https://www.tennessean.com/story/news/2020/03/12/coronavirus-tennessee-state-prisons-visitation-volunteers/5034021002/
[32] Tennessee Department of Correction, *Frequently Asked Questions Regarding COVID-19*, question 11 https://www.tn.gov/correction/frequently-asked-questions-regarding-covid-19.html
[33] Tennessee Department of Correction, *TDOC Visitation Suspended Until Further Notice*, https://www.tn.gov/correction/news/2020/3/12/tdoc-visitation-suspended-until-further-notice.html

174.    Mr. Nichols has been unable to visit with family or friends since the suspension of visitation at RMSI on March 12, 2020.

175.    Phone calls are not an adequate substitute for legal visits.

176.    Phone calls with Mr. Nichols during the pandemic have been brief, infrequent, and non-confidential.

177.    Without legal visitation, Mr. Nichols is unable to assist his counsel prepare his case for clemency.

178.    Without legal visitation, counsel for Mr. Nichols is disadvantaged in conducting the investigation and preparation for clemency required by professional guidelines and needed to effectuate Mr. Nichols' rights to clemency representation under 18 U.S.C. § 3599.

179.    The loss of sixteen weeks of unimpaired work effort on behalf of Mr. Nichols' pursuit of clemency cannot be remedied before August 4, 2020.

180.    As previously discussed, on May 29, 2020, counsel requested and was denied a legal visit with Mr. Nichols.

181.    Seven days later, Defendant Warden Mays approved a non-contact visit with a facial covering requirement. Although counsel has visited Mr. Nichols at RMSI for twenty years, she was also required to provide RMSI with the court order of appointment. (Exh. 10, Chavis Decl. Attachment B pp.17-19).

182.    On June 22, 2020, counsel requested a legal visit for herself and a paralegal. The same day, Defendant Warden Mays requested and received

documentation regarding the paralegal's employment by FDSET and her identification. (Exh. 10, Chavis Decl. Attachment D pp.24-26).

183. As previously discussed, on June 23, 2020, counsel was instructed that a new visitation policy had been implemented and both she and Mr. Nichols' paralegal would have to present a medical record showing a negative result on COVID-19 test dated within three weeks of the visit. About five hours later Defendant Warden Mays and Defendants John and Jane Does TDOC Employees withdrew the request for medical records and Mr. Nichols' legal team members were permitted a non-contact visit. (Exh. 10, Chavis Decl. Attachment D p.23).

184. Counsel was never provided a copy of the visitation policy requiring a COVID-19 test.

185. The denial of visits by friends family and a spiritual advisor, and—until recently—his legal team, has caused Mr. Nichols to suffer psychological pain as he has been forced to prepare for execution in isolation without emotional or spiritual support.

186. The psychological suffering he endures from preparing for and facing execution in isolation is greater than if he were permitted support from his friends and family and frequent regular visits with his spiritual advisor and legal team.

187. Previous prisoners who were executed in Tennessee were not, and Oscar Smith and Byron Black whose 2020 execution dates were rescheduled likely will not be, subjected to such isolation.

188.    The suffering resulting from such isolation constitutes pain and suffering that is not necessary to achieve an execution.

189.    The suffering resulting from such isolation is superadded to the already-present substantial risk of severe pain and suffering resulting from execution under Tennessee's protocol, when carried-out as intended. The psychological suffering he endures from preparing for and facing execution in isolation is greater than he would endure if he were permitted support from his friends and family and frequent regular visits with his spiritual advisor.

## The prison has not disclosed how it will carry out an execution during a pandemic

190.    Given the pattern of changes to policy without notice, it is reasonable to expect the prison may modify how it carries out Mr. Nichols' execution without providing notice.

191.    The prison has a written protocol governing how executions are to be carried out. (Exh. 20, Lethal Injection Procedure Manual dated July 5, 2018; Exh. 21, Execution Procedures for Electrocution).

192.    Tennessee's execution protocol does not provide notice to Mr. Nichols as to how it plans to carry out his execution during the pandemic. (Exh. 20, Lethal Injection Procedure Manual dated July 5, 2018; Exh. 21, Execution Procedures for Electrocution).

193.    No modifications to the written protocol based on COVID-19 have been produced.

## Mr. Nichols is a practicing Christian; the prison without notice has restricted visitation with his spiritual advisor

194.    Mr. Nichols met with his spiritual adviser J.R. Davis, on a regular basis before the March 12 no-visitation policy at RMSI was implemented. J.R. Davis is a Men's Minister and Recruiter with Men of Valor, a well know Christian faith-based prison ministry established in 1997 to reach out and minister to incarcerated men. (Exh. 14, Davis Decl. ¶¶5-8).

195.    Before March 12, 2020, J.R. Davis routinely and consistently met with other prisoners at RMSI, including death row inmates, particularly when an execution date approached. (Exh. 14, Davis Decl. ¶¶2-3).

196.    Mr. Nichols is a Christian and has been participating in regular structured bible study groups at the prison since they began almost three years ago. (Exh. 14, Davis Decl. ¶5).

197.    Mr. Nichols has many questions of faith and seeks guidance. (Exh. 10, Chavis Decl. ¶61; Exh. 14, Davis Decl. ¶¶5-6).

198.    "During [b]ible study meetings, the group has touched on the subjects of remorse, redemption and forgiveness, but now, with a date for death approaching, Mr. Nichols needs additional, private counseling. He requires guidance on Christian concepts of reconciliation and the final days, the death and dying process, and the transition to heaven." (Exh. 10, Chavis Decl. ¶61).

199.    J.R. Davis runs a bible study group on Sunday evenings for the men on Unit Two and that is where he met Mr. Nichols. (Exh. 14, Davis Decl. ¶3).

200.    Mr. Nichols was one of the first members of this group and never missed a meeting.

201.    Mr. Nichols has a sincere belief in God and Jesus Christ and in the hope forgiveness brings. (Exh. 14, Davis Decl. ¶5).

202.    Before visitation was suspended without notice, Mr. Nichols had much spiritual work to accomplish before his execution and required guidance to do so. (Exh. 14, Davis Decl. ¶6)

203.    Mr. Nichols requires Mr. Davis's assistance in preparing for his death, including help in the preparation of his final statement. (Exh. 14, Davis Decl. ¶5).

204.    J.R. Davis believes that the long period of time, sixteen weeks, without spiritual counseling, has resulted in despair for Mr. Nichols. (Exh. 14, Davis Decl. ¶8).

205.    The loss of religious practice and spiritual guidance for sixteen weeks cannot be remedied before August 4, 2020.

206.    On June 27, 2020, in stark departure from RMSI's prior policy, Mr. Davis received oral permission to visit Mr. Nichols the week of June 29, 2020. (Exh. 14, Davis Decl. ¶9).

207.    Mr. Davis has counseled other men preparing for execution, frequently meeting with them. (Exh. 14, Davis Decl. ¶9).

208.    He meets with them often in a one-on-one contact setting. and with the ability to "lay hands" on the condemned inmate and give him the comfort of healing touch in addition to words from the gospel. (Exh. 14, Davis Decl. ¶10).

43

209. Physical contact is part of the Mr. Davis' ministry, as it was for Jesus Christ.

210. There is no substitute for physical contact.

211. In Mr. Davis's experience, each man for whom he was a spiritual adviser for execution purposes has questions about faith and the afterlife and Mr. Nichols is no exception. (Exh. 14, Davis Decl. ¶10).

212. Because Mr. Davis has not been able to have spiritual visits with Mr. Nichols for months, and, he has been unable to help him prepare for death and impart the loving words of Jesus as he did for other men who have been executed. (Exh. 14, Davis Decl. ¶10).

213. Mr. Nichols has asked that his spiritual advisor be present with him in the execution chamber as he faces death.

214. Finally, Tennessee's execution procedures do not provide for the presence of the condemned prisoner's spiritual advisor in the execution chamber. (Exh. 20, Lethal Injection Procedure Manual dated July 5, 2018; Exh. 21, Execution Procedures for Electrocution).

215. The presence of a spiritual advisor is part and parcel of Mr. Nichols' Christian faith.

216. As of this filing, the prison has not addressed this request.

## II.    Legal Claims

All allegations in this Complaint and the attached Exhibits are incorporated in all sections as if fully set forth therein.

## Count One:

## Proceeding with Mr. Nichols' August 4, 2020 execution violates his rights to Free Exercise of Religion under the First Amendment to the United States Constitution as well as under the Religion Land Use and Institutionalized Persons Act.

217.    Mr. Nichols is a sincere, practicing Christian.

218.    For sixteen weeks, Mr. Nichols was denied any opportunity to meet with his spiritual advisor J.R. Davis, of the well-known and respected Christian prison ministry, Men of Valor. Visitation has not taken place since March 12, 2020, when all visitation at RMSI was suspended due to COVID-19.

219.    As his execution date approaches, Mr. Nichols has been denied the right to the frequent pastoral visits from his spiritual advisor he had enjoyed, and has a recognized right to.

220.    Absent COVID-19 and the visitation ban, RMSI practice would have permitted contact, private pastoral visits on an ongoing basis, with increasing frequency as the August 4 execution date approached.

221.    Mr. Nichols' request for regular visits with his spiritual advisor was denied without explanation except to refer to the blanket bar on visitation, by RMSI on June 10, 2020.

222.    At the time of the entry of the Order setting Mr. Nichols' execution date, an inmate facing execution had an established right to personal contact visits from his spiritual advisor, family and friends in order to prepare himself and his family and friends for his death, which rights were long established under federal and state law and as a matter of longstanding prison practice.

223. Mr. Nichols believes, in accordance with the Christian faith, that being counseled and comforted by his minister is essential to preparing for his death.

224. Mr. Davis has provided this same ministry to other death row inmates in the months and weeks leading up to their executions.

225. On June 27, 2020, Defendants Commissioner Parker and/or Warden Mays and/or John and Jane Does TDOC employees orally advised J.R. Davis that he could visit Mr. Nichols the week of June 29, 2020.[34] (Exh. 14, Davis Decl. ¶9).

226. However, it is unclear whether Mr. Davis will be permitted any additional visits prior to Mr. Nichols' scheduled execution or whether physical contact will be allowed.

227. The State has not articulated a State interest in proceeding with the execution of Mr. Nichols, and Mr. Nichols only, on August 4, in the midst of the COVID-19 pandemic, and accordingly has no justification whatsoever for depriving Mr. Nichols of his well-established rights under the Free Exercise Clause of the First Amendment to the United States Constitution and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc-2000cc-5.

228. The First Amendment and RLUIPA rights at issue here, and the State's ability to inhibit their exercise, are currently before the United States Supreme Court in *Gutierrez*. In a clear signal of the gravity of the issues raised,

---

[34] The circumstances regarding how and why this decision was made are unknown to Plaintiff at this time.

the United States Supreme Court has stayed the *Gutierrez* execution pending the determination of the certiorari petitions. *Gutierrez v. Saenz*, 2020 WL 3248349.

## Proceeding with Mr. Nichols' August 4 execution violates his rights to Free Exercise under the First Amendment

229. A State may restrict religious conduct only when "subject to regulation for the protection of society." *Cantwell v. Connecticut*, 310 U.S. 296, 304 (1940). A State thus violates the Free Exercise Clause where, absent a countervailing interest, a person holds a sincere religious belief and the State substantially burdens his ability to practice his religion. *See Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981).

230. Because clergy's role in executions "was well established and undoubtedly well known, it seems equally clear that the state legislatures that ratified the First Amendment had the same understanding." *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 603 (2014) (Alito, J., concurring). In short, preparation for execution and execution ministry is a fundamental exercise of religion.

231. In *Turner v. Safley*, 482 U.S. 78, 89 (1987), the Supreme Court established a four-factor test for determining whether a burden on a prisoner's religious rights is justified by countervailing State interests: 1) whether there is a valid, rational connection between the prison policy and a legitimate governmental interest; 2) whether the prisoner has "another avenue" to exercise the right; 3) whether accommodating the right will have a significant "ripple effect" on prison

staff or resources; and 4) whether there is a ready alternative that fully accommodates the prisoner's rights. 482 U.S. at 89-91.

232.    In the event of a dispute on any one or all of the factors, a fulsome factual inquiry must be undertaken and a full factual record established against which to apply the *Turner* factors, as the Supreme Court just days ago recognized in *Gutierrez v. Saenz*, 2020 WL 3248349, "[t]he District Court should promptly determine, based on whatever evidence the parties provide, whether serious security problems would result if a prisoner facing execution is permitted to choose the spiritual adviser the prisoner wishes to have in his immediate presence during the execution."

233.    As set forth above, there is no valid, rational connection between a prison policy precluding spiritual visits to a condemned man and a legitimate State interest: to the contrary, the State's consistent practice has been to recognize and foster pastoral visits for a death row inmate.

234.    While certainly COVID-19 supports a policy of protecting the public, the prison population, and its employees by limiting visitation for the period of the public health crisis, as matters stand the period of that public health crisis and the State's insistence on the arbitrarily selected August 4 execution date will deprive Mr. Nichols of his rights under the First Amendment.

235.    The State has no particular interest in insisting on an *August 4* execution, and any protestations to the contrary would do no more than cast

doubt on the State's position that the public health crisis caused by the pandemic requires that no visitation be permitted. In short, the State is acting arbitrarily, and illogically, and this Court should so declare under *Turner*.

### Proceeding with Mr. Nichols' August 4 execution violates his rights under RLUIPA

236.   The RLUIPA provides in no uncertain terms that the government cannot "impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a).

237.   RLUIPA defines "'religious exercise' capaciously to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Holt v. Hobbs*, 574 U.S. 352, 358 (2015) (quoting § 2000cc–5(7)(A)). Congress specified that RLUIPA "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc–3(g).

238.   The RLUIPA is directly targeted at preventing "'frivolous or arbitrary' barriers impeded institutionalized persons' religious exercise." *Cutter v. Wilkinson*, 544 U.S. 709, 716-17 (2005) (citing legislative history). The *Cutter* Court explained that RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the

49

government's permission and accommodation for exercise of their religion." *Id.* at 721.

239.    Based on its language, analysis under RLUIPA can be seen as a "three-act play." *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 458 (6th Cir. 2019). First, "the inmate must demonstrate that he seeks to exercise religion out of a 'sincerely held religious belief.'" *Id.* (quoting *Holt*, 574 U.S. at 361). Second, the inmate "must show that the government substantially burdened that religious exercise." *Id.* Upon satisfaction of these two steps, the burden then shifts to the government for the third act: it "must meet the daunting compelling-interest and least-restrictive-means test." *Id.*

240.    In Mr. Nichols' case, the sincerity of his belief and his consistent exercise of the right to pastoral visits from his spiritual advisor are apparent. The State is not just "substantially" burdening Mr. Nichols' rights, it has completely eliminated them.

241.    The deprivation of such rights to-date cannot be remedied by August 4, 2020.

242.    The State has not ever proposed a theory of how it might attempt to meet the "daunting" challenge of demonstrating a compelling State interest in the enforcement of an arbitrary execution date in the middle of a pandemic. Nor can the State claim that precluding the exercise of religious rights by a condemned man and proceeding with his execution is the "least restrictive" means available.

The date of the execution can—and has been in two other instances—simply be moved to a later date.

243.    At this time, not only does Tennessee not permit a spiritual adviser in the execution chamber (which is the issue in *Gutierrez*), but as a practical matter is prohibiting any exercise of religion by Mr. Nichols before his scheduled August 4, 2020 execution. Mr. Nichols cannot take any of the steps he, as a Christian, sincerely believes necessary to prepare himself for death without meeting with his spiritual adviser, and he has been without such visitation for months and so has been irreparably deprived of the time and opportunity he would otherwise legally and morally have had.

244.    This Court should enjoin Defendants Mays, Parker, and John and Jane Does TDOC employees from carrying out Mr. Nichols' August 4, 2020 execution and issue a Declaratory Judgment finding that to proceed with the planned August 4 execution would constitute a violation of Mr. Nichols' First Amendment and statutory Rights.

## **Count Two:**

**Executing Mr. Nichols on August 4, 2020, during a global pandemic when other Tennessee inmates' execution dates have been moved because of the global pandemic violates Mr. Nichols' rights to Equal Protection under the Fourteenth Amendment.**

245.    The Defendants Justices of the Tennessee Supreme Court found the risks and difficulties created by the global pandemic warranted rescheduling Oscar Smith's June 4, 2020 execution date and Byron Black's October 8, 2020

execution date, but not Mr. Nichols' execution date which falls in the middle on August 4, 2020.

246. As such, Mr. Nichols stands alone as the single Tennessee inmate who must face execution during the global pandemic, even though he is similarly situated to Smith and Black.

247. Defendants Justices of the Tennessee Supreme Court's arbitrary refusal to reschedule Mr. Nichols' execution date and proceed with the August 4 execution is without reason and denies him Equal Protection of the laws.

248. The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." The Equal Protection Clause is essentially a directive that all persons similarly situated should be treated alike. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).

249. The "purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (internal quotations and citations omitted).

250. An Equal Protection claim may be brought by a single person where the plaintiff alleges he has been "intentionally treated differently from others

similarly situated and that there is no rational basis for the difference in treatment." *Vill. Of Willowbrook v. Olech*, 528 U.S. at 563-64.

251. An Equal Protection claim may be brought based upon a ruling or order of a court where the ruling ratifies "unequal treatment." *Bush v. Gore*, 531 U.S. 98, 107 (2000).

252. Defendants Justices of the Tennessee Supreme Court's ruling here results in unequal treatment of Mr. Nichols, and there is no rational basis for the difference in treatment.

253. As previously stated, Oscar Smith's execution was to occur on June 4, 2020. His counsel filed a motion alleging COVID-19 interfered with her ability to prepare for clemency and pursue other judicial remedies. (Coll. Exh. 15, p.3).

254. In support, the March 18, 2020 motion seeking a stay alleged Tennessee had 78 cases of COVID-19 and Davidson County in particular had 46 cases. (Coll. Exh. 15, p.4).

255. On April 17, Defendants Justices of the Tennessee Supreme Court moved Mr. Smith's date to February 4, 2020. The order noted counsel alleged "the COVID-19 pandemic." (Coll. Exh. 15, p.43).

256. Mr. Nichols' execution is to occur on August 4, 2020. On April 30, counsel filed a motion to reschedule his execution date alleging COVID-19 interfered with her ability to prepare for clemency as well as pursue other judicial remedies. The motion alleged Tennessee had 10,366 cases and Davidson County had 2,454 cases. (Coll. Exh. 11, pp.14-15).

257. On June 4, 2020, the Defendants Justices of the Tennessee Supreme Court denied the motion "at this time."

258. Byron Black's execution was to occur on October 8, 2020. On April 29, 2020, his counsel filed a motion alleging COVID-19 interfered with her ability to complete testing necessary for a competency determination as well as to pursue clemency and other judicial remedies. The motion alleged Tennessee had 10,005 cases and Davidson County had 2,588 cases. (Coll. Exh. 16, p.4).

259. On June 12, after denying Mr. Nichols' Motion for Stay, Defendants Justices of the Tennessee Supreme Court granted Mr. Black's motion and moved his execution date to April 8, 2021. The order noted counsel's arguments related to completing competency testing during the COVID-19 pandemic. (Coll. Exh. 16, p.43).

260. On June 15, counsel for Mr. Nichols filed a renewed motion noting that the number of new COVID-19 cases continued to rise, that efforts to commence with clemency work were unfruitful, and that the prison was denying Mr. Nichols access to a spiritual advisor. (Coll. Exh. 11, p.103).

261. As discussed, the Defendants Justices of the Tennessee Supreme Court denied the renewed motion. The order merely summarized the party's positions and did not contain any analysis. (Coll. Exh. 11, p.140). Regarding the denial of access to a spiritual advisor, the court merely stated Nichols had been denied a visit with his spiritual advisor on a particular date and did not note the

denial of access had been ongoing or that the United States Supreme Court had granted a stay of execution for the same reason.

262. In moving Mr. Smith's execution date, Defendants Justices of the Tennessee Supreme Court relied upon counsel's difficulties preparing and presenting clemency and pursuing other judicial remedies during a pandemic. In moving Mr. Black's execution date, the court relied upon difficulties associated with completing competency testing and holding the subsequent hearing during a pandemic.

263. Notably, a competency hearing for Mr. Black was to take place in August 2020, when Mr. Nichols is scheduled for execution.

264. Mr. Nichols similarly has a right to prepare and present a clemency case and to pursue all available legal remedies, but Defendants Justices of the Tennessee Supreme Court, without reason, refused to move his date.

265. Our system of justice depends upon similarly situated people being treated similarly. Defendants Justices of the Tennessee Supreme Court flouted this principal and denied Nichols Equal Protection of the law. It did so not once, but twice, demonstrating the action is intentional.

266. This Court should enjoin Defendants Mays, Parker, and TDOC John/Jane Does from carrying out Mr. Nichols' August 4, 2020 execution and issue a Declaratory Judgment finding that to proceed with the planned August 4 execution would constitute a violation of Mr. Nichols' Rights to Equal Protection of Laws under the Fourteenth Amendment.

## Count Three:

### Carrying out Mr. Nichols' execution during the global coronavirus pandemic, where visitation is severely restricted, is cruel and unusual in violation of the Eighth and Fourteenth Amendments to the United States Constitution and denies his rights of association guaranteed by the First Amendment.

267.   The Eighth Amendment prohibits cruel and unusual punishments and is applicable to the states through the Fourteenth Amendment.

268.   Carrying out Mr. Nichols' execution during a global pandemic violates the Eighth Amendment because he has been denied visitation by his legal team, friends, family, and a spiritual advisor, which unnecessarily and arbitrarily increases his suffering. (Exh. 14, Davis Decl. ¶¶7-8.)

269.   Carrying out the August 4, 2020 execution violates the Eighth Amendment because it superadds suffering from isolation imposed on Mr. Nichols solely on account of the pandemic. (Exh. 14, Davis Decl. ¶¶7-8.)

270.   Carrying out the August 4, 2020 execution violates the Eighth Amendment because of the COVID-19 imposed restrictions on Mr. Nichols' ability to engage in religious practices, and it is so unusual in Tennessee's death penalty jurisprudence as to be arbitrary. Finally, it shocks the conscience and does not accord with the dignity of man.

271.   The Eighth Amendment bars "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976). Its reach extends to "exercises of cruelty . . . other than those which inflict[] bodily pain or mutilation." *Weems v. United States*, 217 U.S. 349, 372 (1910). The Eighth Amendment forbids laws and

punishment subjecting a person to "circumstance[s] of degradation," *id.* at 366, or to "circumstances of terror, pain, or disgrace" that are "superadded" to a sentence of death. *Id.* at 370. An Eighth Amendment violation may exist without physical injury. *Hobbs v. Lockhart*, 46 F.3d 864, 869 (8th Cir. 1995) ("We cannot conclude that plaintiff's emotional distress was not an injury serious enough to be constitutionally cognizable."); *Obama v. Burl*, 477 Fed. App'x. 409, 411 (8th Cir. 2012) (unpublished) (finding a potential Eighth Amendment violation where constant lighting of prisoner's cell "caused inability to sleep, emotional distress, and constant headaches"); *Beal v. Foster*, 803 F.3d 356, 357-58 (7th Cir. 2015) (quoting *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012)) ("[T]he alleged pain sufficient to constitute cruel punishment may be physical or psychological.")).

272.    In the ordinary case, the condemned inmate must come to terms with his impending death and mentally and spiritually prepare himself for death. (Exh. 14, Davis Decl. ¶10). The condemned inmate accomplishes this task with the support and presence of legal counsel, friends, family, and a spiritual advisor. (Exh. 10, Chavis Decl. ¶5; Exh. 14, Davis Decl. ¶10). Mr. Nichols' family, friends, spiritual advisor and legal team would have had frequent visits with him during this time but for the pandemic. The denial of visitation deprives Mr. Nichols of this well-established way of coping with and preparing for his impending death. The denial of visitation isolates Mr. Nichols. It increases his psychological suffering. He is required to endure superadded punishment.

273.    It is unnecessary that Mr. Nichols endure this superadded suffering. Allowing an execution to proceed during a pandemic is arbitrary and cruel. Mr. Nichols could be executed at a time when the prison does not restrict visits by friends, family, and a spiritual advisor. It unnecessarily superadds psychological suffering to the emotional suffering that normally accompanies an execution. It is exactly this kind of "unnecessary and wanton infliction of pain" that the Eighth Amendment prohibits. *Gregg,* 428 U.S. at 173.

274.    In addition, the Supreme Court has ruled unconstitutional those punishments which do not "accord with 'the dignity of man,' which is the 'basic concept underlying the Eighth Amendment.'" *Gregg*, 428 U.S. at 173 (quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958)).

275.    Execution during a global pandemic and its concomitant denial of visitation by legal counsel, friends, family and a spiritual advisor does not comport with "the evolving standards of decency that mark the progress of a maturing society," particularly where other Tennessee inmates have had their execution dates moved. *Trop*, 356 U.S. at 101.

276.    Under *Trop,* courts look to "objective indicia of society's standards, as expressed in pertinent legislative enactments and state practice." *Roper v. Simmons*, 543 U.S. 551, 563 (2005). In this case, the practice in question is uniquely unusual. No Tennessee inmate has had to endure execution during a global pandemic where, despite perfect behavior, he is denied contact visitation from legal counsel, friends, family, and a spiritual advisor in the months, weeks and days prior

58

to his execution. No other inmate has been required to attempt to seek clemency during a pandemic when his legal team is unable to meet even the minimum standards of conduct required of the profession. Other Tennessee prisoners have had their execution dates rescheduled in light of the pandemic, including Oscar Smith and Byron Black. Accordingly, Mr. Nichols' execution is unusual in the history of executions in Tennessee and it is unusual within the context of the current global pandemic. It shocks the conscience and does not comport with evolving standards of decency.

277. *If* participants and witnesses to Mr. Nichols' execution will be required to wear masks and socially distance, such conduct is degrading and does not comport with the dignity of man.[35] The visual barrier a mask creates hides the faces of those present and interferes with expression of support or compassion Nichols' friends, family, and spiritual advisor may show. The mask literally places a veil over human expression, creating circumstances that cannot acknowledge or honor Nichols' dignity and humanity. *Gregg, supra.*

278. As a result of the pandemic, the prison has cancelled all visitation and Mr. Nichols' ability to prepare mentally and spiritually for his death has been impeded. It is as true today as hundreds of years ago that the law values such an opportunity. *Ford v. Wainwright*, 477 U.S. 399, 421 (1986) (Powell, J., concurring) (the execution of person without the ability to prepare for his death would "impose a

---

[35] To Plaintiff's knowledge, Tennessee's execution procedures have not changed. Plaintiff is without knowledge of how procedures will be changed in light of the COVID-19 pandemic.

uniquely cruel penalty"); *see also Thompson v. Bell*, 580 F.3d 423, 440 (6th Cir.

2009).

279. Inmates have a right to maintain contact with their loved ones. The

strict visitation policy denies that right. First Amendment, U.S. Const.

280. This Court should enjoin Defendants Mays, Parker, and John and

Jane Does TDOC employees from carrying out Mr. Nichols' August 4, 2020

execution and issue a Declaratory Judgment finding that to proceed with the

planned August 4 execution would constitute a violation of Mr. Nichols' rights

to be free from cruel and unusual punishment under the Eighth Amendment

and a violation of his association rights under the First Amendment.

## Count Four:

**Carrying Out Mr. Nichols' August 4 2020 Execution during the pandemic where he is denied the opportunity to prepare and present his case for clemency is so arbitrary and unusual it shocks the conscience.**

281. The Fourteenth Amendment provides that "[n]o State shall . . . deprive

any person of life, liberty, or property, without due process of law." U.S. Const.

amend. XIV, § 1. There are procedural and substantive due process components. *See*

*Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014). Substantive due process bars

arbitrary conduct that "shocks the conscience and violates the decencies of civilized

conduct." *Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998) (quoting *Rochin v.*

*California*, 342 U.S. 165, 172-73 (1952)) (internal quotation marks omitted).

282. The question here is not whether Mr. Nichols will be executed but

when. Defendants' conduct in failing to reschedule Mr. Nichols' execution date until

the pandemic has subsided is arbitrary, shocks the conscience, and violates the

decencies of civilized conduct. Defendants insist on moving forward with the execution date when the following circumstances are present:

- The country is in the grip of a global pandemic;

- The number of new COVID-19 cases in the United States is rising in precipitously;

- The numbers of new cases in Tennessee and in Davidson County are rising precipitously (Coll. Exh. 22, Governor Lee Executive Order No. 50 (June 29, 2020); Metro Nashville Health Director Order 8 (June 28, 2020);

- Safety concerns prevent the defense team from performing its function during this critical time in the case;

- Safety concerns prevent the prison from permitting visits by family, friends, or a spiritual advisor;

- Mr. Nichols is deprived of emotional or spiritual support during the months leading to his execution, which needlessly increases his suffering, *see* Eighth Amendment Claim *infra*;

- Mr. Nichols is deprived of rights other prisoners executed in Tennessee exercised after an execution date was set, and rights Oscar Smith and Byron Black likely will exercise;

- The denial of access to his legal team, spiritual advisor and association with his friends and family violates his rights under the First Amendment and other federal law, *see* First Amendment Claim *infra*;

- Defendants have not disputed the dangerous conditions created by COVID;

- Defendants' actions put numerous individuals' health at risk, including that of innocent members of the victim's family, members of the press, the defense team, the sheriff, the surrounding Nashville community, and the personnel and prisoners at RMSI;

- Defendants are aware that introduction of COVID-19 into the prison creates a high risk of a significant outbreak, as has occurred in TDOC's Trousdale Turner Correctional Facility and Blount County Adult Detention Facility, and in the prison in Missouri soon after it executed Walter Barton on May 19, 2020.

- Tennessee's execution procedures do not address conducting an execution during a pandemic such as the current COVID-19 crisis.

- Defendants have no compelling interest in executing Mr. Nichols on August 4, 2020.

283. As of this filing, 126,739[36] people in the United States have died from COVID-19 in a few short months. Caregivers have contracted the virus and died. Infected people have transmitted the disease to other family members, including the elderly and minor children and some of those vulnerable have died. By insisting

---

[36] Coronavirus Disease 2019 (COVID-19) Cases in the U.S. https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Jun. 30, 2020).

on executing Mr. Nichols during the height of the pandemic, Defendants are creating a dangerous situation where COVID-19 could be easily transmitted.

284.    The August 4, 2020 execution date is arbitrary. No compelling State interest is served by moving forward on that particular day. The State Defendants' conduct shocks the conscience.

285.    This Court should enjoin Defendants Mays, Parker, and John and Jane Does TDOC employees from carrying out Mr. Nichols' August 4, 2020 execution and issue a Declaratory Judgment finding that to proceed with the planned August 4 execution would constitute a violation of Mr. Nichols' rights to be free from cruel and unusual punishment under the Eighth Amendment.

## Count Five:

**Proceeding to execution under pandemic conditions, where Defendants Parker and/or Mays, and/or Defendants John and Jane Does TDOC employees without notice changes policies and procedures, deprives Mr. Nichols of due process and access to the courts.**

286.    The right of access to the courts is a "fundamental constitutional right" that states are bound to "insure is adequate, effective, and meaningful." *Bounds v. Smith,* 430 U.S. 817, 822, 828 (1977). Meaningful access means that state authorities must ensure that inmates have "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Lewis v. Casey,* 518 U.S. 343, 351 (1996).

287.    The core of due process is "the right to notice and a meaningful opportunity to be heard." *LaChance v. Erickson,* 522 U.S. 262 (1998). The

"fundamental requisite of due process of law is the opportunity to be heard…."
*Mullane v. Central Hanover Bank,* 339 U.S. 306, 314 (1950).

288.    Mr. Nichols has no way to know how Defendants Parker and/or Mays, and/or Defendants John and Jane Does TDOC Employees plan to carry out his execution in light of the pandemic. Within the last approximately 30 days, they have suddenly announced new procedures and requirements regarding visitation and both denied and granted visitation rights.

289.    Even though Mr. Nichols has exemplary behavior, he has been denied all visitation during the pendency of his execution date and only recently has been permitted non-contact visits with his legal team under circumstances which impair communication and do not ensure confidentiality. Defendants Parker and/or Mays, and/or Defendants John and Jane Does TDOC Employees have also denied visits by a spiritual advisor but on June 27, 2020, told Mr. Nichols' spiritual adviser that he would be permitted to visit the week of June 29. These are unexpected and arbitrary changes in prison policy and practice. It is reasonable to anticipate Defendants Parker and/or Mays, and/or Defendants John and Jane Does TDOC Employees will continue to make changes to procedures and arbitrarily grant and deny access to Mr. Nichols as the execution date draws near.

290.    Defendants Parker and/or Mays, and/or Defendants John and Jane Does TDOC Employees have not released execution procedures that set forth how to carry out the execution in a safe manner in light of COVID-19.

291.    Further, Mr. Nichols has requested TDOC and Defendant Mays to disclose records regarding its execution procedures and practices, but contrary to Tennessee Public Records law, those records have not been disclosed. The Execution Protocol Manual requires that Defendants Parker and Mays practice carrying out executions on a monthly basis, and they do so more frequently as an execution date draws near. Mr. Nichols' records request included the records documenting those so-called practice sessions. (Exh. 13, Email to Debbie Inglis dated June 23, 2020).

292.    The refusal to disclose the public records requested denies Mr. Nichols access to the courts and his right to due process because he cannot challenge an events that arises from those records. Because the prison has failed to disclose how it will carry out the execution in light of COVID-19, Mr. Nichols is unable to bring any legal challenges an amended protocol could raise, which denies his access to the courts. *Bounds, supra; Lewis v. Casey, supra.* Further, the failure to disclose an amended protocol denies Mr. Nichols due process of law by denying him notice as to how the execution will be accomplished during the global pandemic. *Mullane, supra.*

293.    This Court should enjoin Defendants Mays, Parker, and TDOC John/Jane Does from carrying out Mr. Nichols' execution until the Defendants produce an execution protocol that addresses carrying out an execution during the pandemic. An execution date should be set no fewer than 60 days after the release of a new protocol so that Mr. Nichols may pursue legal challenges if warranted.

<u>**Count Six:**</u>

<u>**Proceeding with Mr. Nichols' August 4, 2020 execution under the
conditions created by COVID-19 deprives him of his statutory right to
counsel under 18 U.S.C. § 3599.**</u>

294.    Mr. Nichols has a statutory right to counsel under 18 U.S.C. § 3599(e)

to assist him in the pursuit of legal remedies in the federal courts and for the

duration of litigation related to when an execution warrant has been set, including

in state clemency and competency proceedings.

295.    In order to effectuate this right and render it meaningful, Mr. Nichols,

at a minimum, requires regular access to his counsel over the period of time that his

execution warrant has been set. This access is critical so that Mr. Nichols can assist

counsel in clemency and other representation, and so that counsel can regularly

observe his mental and emotional state to assess his competency.[37]

296.    Here, Mr. Nichols repeatedly has been denied access to counsel due to

the COVID-19 pandemic, and what access has been given has been wholly

insufficient to constitute the meaningful assistance of counsel contemplated by

federal statute. By planning to proceed with his August 4 execution date,

Defendants have deprived Mr. Nichols of his rights under 18 U.S.C. § 3599.

---

[37] Many prisoners, especially those suffering from mental illness, begin to
deteriorate as an execution date approaches. (Exh. 9, Wright Decl. ¶25) ("Many
clients suffer from mental illness. These clients often become more anxious, agitated
or even psychotic as clemency proceedings progress."). Mr. Nichols has been
diagnosed with "intermittent explosive disorder" as well as "dissociative disorder"
likely related to the repeated abuse and trauma he suffered as a child. For counsel
to be able to represent him within the meaning of § 3599, they require access to
observe his mental state on an ongoing basis as the execution date approaches. This
is currently impossible due to the pandemic.

297.    Prior to the COVID-19 pandemic, on January 15, 2020, Defendants

Justices of the Tennessee Supreme Court set Mr. Nichols' execution date. Counsel

for Mr. Nichols was actively involved in the representation of two other prisoners

under execution warrant at that time. Nevertheless, counsel from FDSET sought to

arrange a legal visit with Mr. Nichols on January 24, 2020, to discuss the setting of

the execution date for August 4, 2020, and plans to proceed in his case. That visit

was cancelled by the prison due to a lockdown unrelated to Mr. Nichols. Another

attorney from FDSET was able to visit with Mr. Nichols on January 31, while

counsel for Mr. Nichols remained actively involved in the representation of the two

other aforementioned clients.

298.    Roughly four weeks later, on March 12, 2020, Defendants Parker

and/or Mays, and/or Defendants John and Jane Does TDOC Employees, suspended

all visitation to prisons in light of COVID-19. This order extended to legal and

religious visits. On March 19, 2020, FDSET sought to schedule a legal call with Mr.

Nichols. The call never came. The investigator then requested a legal visit the

following week. The visit was denied but a legal phone call took place a few days

later.

299.    The last week of March, a FDSET investigator had made travel

arrangements to two different states to visit with two relatives crucial to Mr.

Nichols' clemency case: his daughter and sister. (Significantly, his sister suffered

the same abuse that was a critical component of his case for clemency). Due to

COVID-19 travel restrictions enacted by FDSET, this visit had to be cancelled.

300.    On April 28, FDSET counsel received notice that work and travel restrictions would remain in place until at least May 30, 2020.

301.    On April 30, counsel filed for a stay of execution in the Tennessee Supreme Court due to their ongoing inability to properly represent Mr. Nichols ahead of his execution date.

302.    Throughout April, May, and into June, counsel and staff sought to arrange legal phone calls with Mr. Nichols. Some of the calls did not occur. Some of the calls were cut-off after five minutes. Some lasted the allotted 30 minutes, but the efficacy of the calls was affected by a time delay and echo effect. In addition, on at least one of the calls, someone from the prison was listening in without having initially indicated that they were on the line.

303.    The last week of May, counsel sought special permission from both FDSET and the prison for leave to visit with Mr. Nichols in person. On June 9, 2020, Defendants Parker and/ or Mays, and or Defendants John and Jane Doe TDOC Employees, denied the visit. The Defendants Justices of the Tennessee Supreme Court had not yet ruled on the April 30 Motion for Stay.

304.    On June 4, Defendants Justices of the Tennessee Supreme Court, after three supplements filed by Mr. Nichols' counsel in support of a stay, issued an order denying the Motion "at this time." The next day, Defendant Warden Mays rescinded the prior denial and approved the June 9 legal visit. The June 9, 2020 legal visit was the first time since March 2020 that members of Mr. Nichols' legal team were permitted to speak with him in person.

305.    During this visit, which was in a non-contact room, and during which counsel was required to wear a mask resulting in further difficulties with being heard and understood, Mr. Nichols was able to share some important information relating to his case for clemency and also the ways in which his religious exercise had been restricted by COVID-19 complications.

306.    At this point—fewer than 60 days before his scheduled execution date—counsel had been unable to complete the lion's share of the work she would ordinarily do in preparation for clemency. Were it not for COVID-19, the work that would have been ongoing would have included:

- requesting, reviewing and conducting follow-up investigation into documentary evidence;

- interviewing testifying and non-testifying witnesses, prior law enforcement and prior defense counsel and prosecutors;

- interviewing persons with knowledge of the client before incarceration;

- interviewing persons with knowledge of the client's family, client's childhood environment, school and work experiences' interviewing persons with knowledge of the client post-incarceration;

- interviewing persons having current contact with the client;

- identifying, interviewing, mobilizing the client's support system as well as new clemency supporters;

- investigating areas such as victim outreach and juror outreach and jury claims; and

- identifying, contacting and mobilizing people and groups in support of clemency.

307.    Aside from the review of case files and legal briefs counsel was able to access from her home computer, none of this work could safely take place because of the COVID-19 crisis.

308.    Counsel's work in clemency and in warrant-stage litigation are governed by national guidelines and practice standards.

309.    Of particular note, these Guidelines require that all such investigative work be done face-to-face and in-person, something which has been rendered unsafe—if not impossible—during the COVID-19 pandemic. This is true for several reasons, not least because it is easier to establish a rapport (and thus elicit useful information) with someone face-to-face, particularly someone who has not been spoken to about the case in years,[38] and because counsel needs to determine how credible the source of the information is and whether they could be a useful messenger in clemency.

310.    In affirming that Congress intended death-sentenced prisoners to receive the assistance of federally funded counsel in clemency proceedings under 18 U.S.C. 3599, the Supreme Court noted, "[f]ar from regarding clemency as a matter of mercy alone, we have called it "the 'fail safe' in our criminal justice system." *Harbison*, 556 U.S. at 192 (internal citations omitted).

---

[38] Eighteen years between habeas investigation and when the execution date was set.

311.    The significance of counsel's assistance during this last stage of a death penalty case was also noted by governors who served as amicus curiae in the Supreme Court in *Harbison*. There, they argued that "for state clemency proceedings to serve their historic "fail-safe" function in capital cases, the participation of counsel is vital. Without counsel, there is a serious risk that Governors and the responsible administrative bodies will not obtain the information they need to make fully informed clemency decisions." *Harbison v. Bell*, Brief of Current and Former Governors as Amicus Curiae in Support of Petitioner, No. 07-8521, 2008 WL 4264488 (Sept. 15, 2008).

312.    Additionally, governor amici noted, "An attorney's role in the capital clemency process is critical even when the request for clemency is ultimately denied." *Id.* at *17. This is because, "[a]n attorney's ability to investigate, frame issues for consideration, and thoroughly present a petition on the applicant's behalf ensures that the decision to apply the death penalty is not made until an inmate has had every opportunity to demonstrate that the sentence is not warranted in his case." *Id.*

313.    Clearly, the type of preparation for clemency and assistance in reaching such a weighty decision has not been possible in Mr. Nichols' case, given the current circumstances.

314.    In *McFarland v. Scott,* the Supreme Court addressed whether Section 3599(e)'s precursor, 21 U.S.C. § 848(q)(4)(b), gave the federal court jurisdiction to enter a stay of execution in furtherance of its appointment of counsel to investigate

and file a habeas petition, where a habeas petition had not yet been filed. 512 U.S. 849, 851 (1994). The Supreme Court held that because the plain language of the statute provided for the appointment of counsel pre-petition, it had jurisdiction to enter a stay of execution to further the appointment. *Id.* at 858-859. Otherwise, the appointment order would be without effect. *Id.*

315.    Similarly here, counsel's representation extends to the pre-execution phase. Counsel have been denied the ability to complete the tasks associated with this phase of the case, including regularly assessing Mr. Nichols for competency and comprehensive preparation of his clemency case. Mr. Nichols has thus been deprived of the representation to which he is entitled.

316.    In *Holiday v. Stephens,* the petitioner sought new Section 3599 counsel because his original 3599 counsel declined to seek clemency for him on the grounds of futility. During the pendency of his then-pending appeal from the denial of his substitution motion, his original 3599 counsel filed a clemency petition on his behalf. Thus, the Supreme Court denied review. 136 S.Ct. 387 (2015). Justice Sotomayor issued a concurring opinion explaining that when Congress authorized federally funded counsel to represent the condemned inmate in clemency proceedings, it did not want "condemned men and women to be abandoned by their counsel at the last moment and left to navigate the sometimes labyrinthine clemency process from their jail cells." *Id.* at 388 (quoting *Harbison*, 556 U.S. at 194).

317.    This Court has the authority under *McFarland, supra,* to enjoin the State of Tennessee from executing Mr. Nichols on August 4, 2020 until such time as

counsel can safely and adequately provide the representation contemplated by Section 3599. This action is consistent with *McFarland* and Section 3599 and is the only remedy for the denial of 3599 counsel at the pre-execution phase of the case.

318.   This Court should enjoin Defendants Mays, Parker, and TDOC John/Jane Does from carrying out Mr. Nichols' August 4, 2020 execution and issue a Declaratory Judgment finding that to proceed with the planned August 4 execution would constitute a violation of Mr. Nichols' appointment of and right to counsel under 18 U.S.C. §3599.

## Count Seven:

### Proceeding with Mr. Nichols' August 4, 2020 execution despite the COVID-19 pandemic violates Mr. Nichols' rights to "Minimal Due Process" under *Ohio Adult Parole Authority v. Woodard* and the Fifth and Fourteenth Amendments to the United States Constitution.

319.   As a result of the COVID-19 pandemic, Mr. Nichols has been deprived of the opportunity to consult with his attorneys in preparation for clemency, and Mr. Nichols' attorneys have been unable to pursue even a fraction of the work they would otherwise undertake—and are ethically and professionally obligated to carry out—in clemency representation.

320.   This deprivation has only occurred because of the COVID-19 pandemic, and can easily be cured by resetting Mr. Nichols' execution date to a time when his clemency representation would not be so significantly curtailed. Because proceeding with Mr. Nichols' August 4, 2020 execution date is wholly arbitrary and violates his rights under the First, Fifth, Eighth, and Fourteenth Amendments, as explained

*infra*, proceeding with Mr. Nichols' August 4 execution also constitutes a violation of his rights to "minimal due process" in clemency.

321.    Although executive clemency is typically not considered the "province of the courts," the United States Supreme Court has found that "some *minimal* procedural safeguards apply to clemency proceedings." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 289 (1998) (O'Connor, J., concurring). *See also Young v. Hayes*, 218 F.3d 850, 853 (8th Cir. 2000) (minimal due process violated when a state "…unconscionably interferes with a process that the State itself has created".).

322.    In *Workman v. Summers*, this Court reiterated that a "court's review [of clemency proceedings] is limited to determining whether some *minimal* procedural safeguards existed." 136 F. Supp.2d 896, 898 (M.D. Tenn. Mar. 28, 2001). It is therefore accepted that while there is no constitutional right to a grant of clemency or to specific procedures governing the clemency process, *Ohio Adult Parole Authority* stands for the proposition that courts can play a role in ensuring death-sentenced prisoners in clemency receive at least minimal due process protections.

323.    Here, Mr. Nichols does not seek judicial intervention to mandate certain procedures be followed or to command certain actions. That Defendants have been frustrating Mr. Nichols' access to legal counsel and suspended all visitation "until further notice" may even be well founded in safety considerations in light of COVID-19. These facts, in and of themselves, are not the bases on which

74

Mr. Nichols claims his rights to minimal due process have been violated. Rather, it is the Defendants' singular insistence on proceeding with the August 4, 2020 execution date in *spite* of these and other extraordinary circumstances created by the COVID-19 pandemic, that is so arbitrary as to rise to the level of a violation of minimal due process.

324.    To establish a violation of the "minimal due process," a prisoner has to establish the violation of a substantive Constitutional right. *Olim v. Wakinekona*, 461 U.S. 238, 250-51 [103 S.Ct. 1741, 75 L.Ed.2d 813] (1983) (explaining that "[p]rocess is not an end in itself" and holding that a State's creation of administrative procedures "does not create an independent substantive right" under the Due Process Clause).

325.    In evaluating a claim of deprivation of due process under the Fifth or Fourteenth Amendment, "[t]he first question asked[…] is whether a life, liberty, or property interest within the meaning of the Due Process Clause is implicated in the case." *Walker v. Hughes*, 558 F.2d 1247, 1250 (6th Cir. 1977) (citing *Board of Regents v. Roth*, 408 U.S. 564 (1972)).

326.    Here, we know that Mr. Nichols retains an interest in his life, because he has not yet been executed. *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. at 289 ("But it is incorrect, as Justice Stevens' dissent notes, to say that a prisoner has been deprived of all interest in his life before his execution.") (O'Connor, J., concurring).

327. The next question is, "what process must be granted before the person can be deprived of the protected interest." *Walker v. Hughes,* 558 F.2d 1247, 1250 (6th Cir. 1977). The inquiry "must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by government action." *Id.* at 1256-57.

328. Here, the two sides of the coin are clear. On Defendants' side is the interest in timely carrying out the judgment of death; on Mr. Nichols' side, the interest in not being executed without access to the same sort of representation, counsel, and guidance he would receive were it *not* for the circumstances of COVID-19.

329. Importantly, Mr. Nichols' interest in such process is not minimal. *Harbison,* 556 U.S. at 193 ("Congress' decision to furnish counsel for clemency proceedings demonstrates that it, too, recognized the importance of such process to death-sentenced prisoners….").

330. On balance, Mr. Nichols' interests here should be accorded more weight than the Defendants'. Mr. Nichols' interest in a clemency process that is not wholly arbitrary corresponds with his interest—not yet extinguished—in his life. *Ohio Adult Parole Authority,* 523 U.S. at 289 (O'Connor, J., concurring). The Defendants, by contrast, have not offered any reason why Tennessee needs to proceed with the scheduled August 4 execution date.

331. Mr. Nichols has been on death row for 30 years. The State has not claimed that if Mr. Nichols is not executed by August 4, 2020, it will be unable to do

so in the future. Mr. Nichols is not terminally ill. He is not likely to die of natural causes before the State has an opportunity to execute him. The State has not argued that its execution drugs will expire if not used this August. There is no reason to believe that his execution is less likely to proceed if it is reset to 2021, as occurred for Oscar Smith and Byron Black.

332.    While courts are reluctant to impose specific affirmative requirements on clemency processes, *see, e.g., Noel v. Norris*, 336 F.3d 648, 649 (8th Cir. 2003) (noting that "it is a rare case that presents a successful due process challenge to clemency procedures themselves"), that does not resolve the question of whether whatever process has been provided them is unconstitutionally arbitrary. Nor does rescheduling the execution date impose any requirements on the Governor's clemency process; it simply provides Mr. Nichols with a fair and equal opportunity to *seek* clemency from the Governor.

333.    In *Walker*, while the court of appeals was reluctant to impose the full panoply of procedural protections the district court ordered prisoners be provided internal disciplinary proceedings, it nonetheless advised that the question of the process due turned on whether it presented a "hazard of arbitrary decision-making" to the plaintiffs. *Walker v. Hughes*, 558 F.2d 1247, 1259 (6th Cir. 1977). Proceeding with Mr. Nichols' execution under the circumstances outlined in this Complaint entails just such a hazard.

334.    Together with notice and an opportunity to be heard, arbitrariness is the central question in any due process inquiry. *See Ohio Bell Tel. Co. v. Pub.*

*Utilities Comm'n of Ohio*, 301 U.S. 292, 302 (1937) (due process entails the "protection of the individual against arbitrary action."); *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government, *Dent v. West Virginia*, 129 U.S. 114, 123, 9 S.Ct. 231, 233, 32 L.Ed. 623 (1889).")

335.    Seeking to proceed with Mr. Nichols' August 4 execution date despite the fact that:

- execution dates scheduled before and after Mr. Nichols' execution have been rescheduled on similar grounds;

- Mr. Nichols has been permitted only *two* legal visits in the now more-than six months since his execution date has been set, rather than meeting once or twice *weekly* with his counsel as would be practice were it not for the pandemic;

- Mr. Nichols has been denied visitation with persons who would otherwise provide important information for his clemency campaign;

- counsel have been prohibited both by their employer and, for a period of time, by the State of Tennessee itself, from conducting the investigation in support of clemency that would ordinarily be undertaken;

- businesses, schools, the courts, state agencies, and the prison system have been closed for the majority, if not all, of the time Mr. Nichols has been facing death, creating additional unforeseen obstacles to preparing the case for clemency; and

- Mr. Nichols has been unable to meet with his spiritual advisor, family members, or friends either to discuss his case for clemency or prepare for death,

is so unnecessary and arbitrary as to deprive Mr. Nichols of even the minimal process due death-sentenced prisoners in clemency.

336. Arbitrariness has colored every aspect of Mr. Nichols' experience in pursuing clemency during the pandemic. TDOC and Defendants Parker and/or Mays, and/or Defendants John and Jane Does TDOC Employees, have repeatedly changed policy and policy decisions regarding visitation in light of COVID-19. In fact, the only two visits with counsel Mr. Nichols has been permitted were initially denied or contingent on new requirements, prompting counsel to take time away from what limited clemency preparation they have been able to conduct to both comply with and strategize how best to compel the prison to permit this visitation.

337. Legal phone calls with Mr. Nichols have been inadequate to effectuate his right to legal representation. Not only have these calls been difficult to schedule and difficult to hear, on at least one occasion, they were being listened in on by prison personnel. These circumstances are sufficiently problematic and inimical to ordinary process in clemency proceedings to give rise to the hazard of arbitrary decision-making.

338. Additionally, the significantly more time granted Oscar Smith and Byron Black to prepare their cases for clemency triggers concerns over fundamental fairness in the comparative process afforded. More time to prepare for clemency

provides more opportunities for investigation, the development of important allies, conversations to be had with the Governor and people close to the Governor whom he has stated he consults with in making clemency decisions.

339.    There is no accepted alternative to in-person interviews to discuss highly sensitive or personal information. The very procedures necessary to stem the spread of the COVID-19 pandemic will "will significantly undermine any case for clemency being made during this time." (Exh. 9, Wright Decl. ¶ 35).

340.    Proceeding with Mr. Nichols' August 4, 2020 execution for no other reason than that is the date which was initially set and forcing him to investigate and present a clemency application amid the conditions created by a global pandemic, when no other Tennessee prisoner is subject to the same, is the rare situation that is so arbitrary as would be deciding his fate by coin-flip. *Ohio Adult Parole Authority,* 523 U.S. at 289 (O'Connor, J., concurring).

341.    This Court should enjoin Defendants Mays, Parker, and TDOC John/Jane Does from carrying out Mr. Nichols' August 4, 2020 execution and issue a Declaratory Judgment finding that to proceed with the planned August 4 execution would constitute a violation of Mr. Nichols' rights to minimal due process under the Fifth and Fourteenth Amendments and recognized by the United States Supreme Court in *Ohio Adult Parole Authority v. Woodward,* 523 U.S. 272 (1998).

### III.    <u>Conclusion</u>

For these reasons, Plaintiff requests the following relief. This Court should enjoin Defendants Mays, Parker, John/Jane Does TDOC Employees from carrying

out Mr. Nichols' August 4, 2020 execution because doing so would constitute a violation of his Constitutional and statutory rights and issue a Declaratory Judgment so finding. This Court should issue a Declaratory Judgment finding that by failing to reset Mr. Nichols' execution date, Defendants Justices of the Tennessee Supreme Court have violated his federal and statutory rights described herein. Upon issuance of such declaration, this Court should remand this case to the Tennessee Supreme Court to reset Mr. Nichols' execution date for a time, no earlier than the execution dates reset for Oscar Smith and Byron Black, and during which Mr. Nichols' counsel can adequately prepare for clemency proceedings without the hindrances described herein, and Mr. Nichols can exercise visitation rights and exercise his religion and consult with his spiritual advisor and prepare himself for death.

Further, this Court should require Defendants Mays, Parker and/or John/Jane Does TDOC Employees to produce an execution manual that provides for conducting an execution during the pandemic and direct that no execution can occur until at least 60 days after disclosure of the protocol to allow for review and any potential challenges to be raised.

Respectfully submitted this 30th day of June, 2020.

**FEDERAL DEFENDER SERVICES
  OF EASTERN TENNESSEE, INC.**

/s/ Susanne Bales
Susanne Bales
Asst. Federal Community Defender

/s/ Dana C. Hansen Chavis
Dana C. Hansen Chavis
Asst. Federal Community Defender

800 South Gay Street, Suite 2400
Knoxville, Tennessee 37929
Telephone: 865.637.7979
Email: Susanne_Bales@fd.org
       Dana_Hansen@fd.org

**DLA Piper LLP (US)**

/s/ Abigail T. Reardon
Abigail T. Reardon
New York State Bar No. 1814557
1251 Avenue of the Americas
New York, New York 10020
Telephone: 212.335.4500
Email: Abigail.Reardon@dlapiper.com
*Pro Hac Vice pending*

/s/ Chelsea R. Dal Corso
Chelsea R. Dal Corso
California State Bar No. 290663
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, California 90067
Telephone: 310.595.3000
E-mail: Chelsea.Dalcorso@dlapiper.com
*Pro Hac Vice pending*

***Counsel for Plaintiff Nichols***

**Certificate of Service**

I, Susanne Bales, hereby certify that a true and correct copy of the foregoing

document was filed electronically via the Court's CM/ECF document filing system

and sent to the following via email on this the 30th day of June, 2020, to:

Scott C. Sutherland, Deputy Attorney General
Miranda Jones, Asst. Attorney General
Rob Mitchell, Asst. Attorney General
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville TN 37202
(615) 532-7688
Scott.Sutherland@ag.tn.gov
Robert.Mitchell@ag.tn.gov
Miranda.Jones@ag.tn.gov

Andrée Sophia Blumstein, Solicitor General
c/o Amy L. Tarkington, Associate Solicitor General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-2216
Amy.Tarkington@ag.tn.gov

Debbie Inglis, TDOC Deputy Commissioner
 and General Counsel
320 6th Avenue North
Nashville, TN 37243
(615) 253-8147
Debbie.Inglis@tn.gov

/s/ Susanne Bales
Susanne Bales